CHARLES DAHL v. MARTIN WUNDERLICH.
W. E. PRESTON AND ANOTHER, RESPONDENTS.[1]

March 15, 1935.

No. 30,226.

*Orr, Stark, Kidder & Freeman,* for relator.

*Bundlie & Kelley,* for respondents W. E. Preston and New Amsterdam Casualty Company.

*Robert E. Faricy,* for respondent Charles Dahl.

JULIUS J. OLSON, JUSTICE.

*Certiorari* to review an order of the industrial commission. The issue before us is whether at the time of injury the employe was working for Wunderlich, relator, or Preston, respondent. The referee found Preston to be such employer, but upon appeal the commission unanimously found that Wunderlich was such and made

[1]Reported in 259 N. W. 399.

an award in conformity with that finding. An exhaustive memorandum is attached to the commission's formal award.

Relator is a road contractor possessing a great deal of road machinery and equipment. He maintained a camp at Brookston, this state, under the supervision of one Bruce. Preston is also engaged in the road contracting game but not as extensively as Wunderlich. On October 27, 1932, an agreement or lease was entered into between these men whereby Wunderlich furnished to Preston four No. 60 tractors, three seven-yard Euclid wagons, and two Kohler light plants at certain stated rates. The agreement contains this provision:

"Party of the second part [Preston] agrees to pay for all labor and to furnish all repairs, gas, oil and grease, and to maintain equipment in the same shape as when received, reasonable wear excepted. Party of the first part [Wunderlich] agrees to furnish drivers for tractors and pay them at the rate of $130.00 per month, 1 cat mechanic who shall also act as tractor driver at $155.00 per month, and 2 dump men at the rate of $130.00 per month, and party of the second part agrees to reimburse party of the first part for the same. Party of the second part agrees to furnish transportation for these men from and to party of the first part's camp at Brookston, Minn."

Shortly before the time of accident Mr. Bruce had left an order with an employment agency at Minneapolis to engage a caterpillar mechanic and driver. In the vernacular of road contractors such men are known, so we are informed, as "cat skinners." The employe, a blacksmith by trade, living in Minneapolis and being unemployed, on November 12, 1932, went to this employment agency to secure a job. He was given an employment slip in duplicate. The slip reads as follows (the italicized words and figures indicating what was written into the printed blank by the employment agency):

"MIDWEST EMPLOYMENT BUREAU

"Phone Geneva 8709    N. J. Duddy, Prop.    101 Marquette Ave.

Order No. *633*                                   C  No. 583

Minneapolis, Minn.  *Nov. 12 1932*
Name of Applicant   *Chas. Dahl*
Name of Employer   *Martin Wunderlich*
Address of Employer   *Brookston, Minn.*
Report to  *Go Today*  Time  *Nov. 12, '32*
Nature of Employment  *Cat Skinner*
Duration of Employment  *Don't know   Doubtful*
Wages *$50¢ Hr.*  Board *$1.00 Day*
Railroad Fare  *Go out own car*
Any Strike or Lockout  *No*
Fee Paid Agency  *3.00*
Balance due Agency  *None*
Receipt Issued by  *J. Freier*
EMPLOYER NOTE—If bearer is hired, retain this duplicate
of receipt."

· He proceeded to Brookston on the same day, and when he arrived there presented his employment slip to Bruce and was assigned to his quarters. One of the duplicate employment slips was delivered to Bruce, who retained it, and the employe retained the other. Mr. Bruce informed the employe that because of the cold weather there would be no immediate work but that it would be satisfactory to remain at the camp waiting better weather. No charge would be made for board or quarters until work started, when one dollar a day would be charged for board and quarters out of the daily wage, which was fixed at 50 cents an hour, a day's work being ten hours.

One of the men furnished by Wunderlich to operate one of the leased tractors upon the Preston job had quit or had been discharged. The foreman at Preston's camp sent word to Mr. Bruce requesting that a man be procured to take the discharged employe's place. Bruce told Dahl to go to work at Preston's camp until work started at the Wunderlich camp. Dahl was transported to Preston's camp, some 20 miles distant, on November 14 in a vehicle owned by Wunderlich and the driver of which was his employe. Dahl commenced work during the evening of November 14 upon one of the Wunderlich tractors leased by Preston. Later during

the night he was put to work repairing one of Wunderlich's machines also leased by Preston. While doing this work gasolene or kerosene was used to thaw out certain parts that were frozen. Some of this was spilled upon his shoes, and his feet became wet. The weather was very cold and inclement, but Dahl did not discover his predicament until the next morning, when his feet started to thaw out and it was found he had been badly frozen. Dahl was paid for ten hours' work at 50 cents per hour, less one dollar for subsistence charges, by check, in the sum of four dollars, executed by Bruce but drawn upon the fund furnished by Wunderlich. The face of the check bears this significant statement at the lower left corner:

"Cat Skinner for Preston job.
"Paid in Full."

Another item of evidence introduced by Preston and known as exhibit 1 bears this heading:

"BROOKSTON, MINN., Nov. 15, 1932.
"STATEMENT OF CHARGES BY MARTIN WUNDERLICH CO., BROOKSTON, MINN., AGAINST E. PRESTON, FLOODWOOD, ON ACCOUNT OF RENTAL OF EQUIPMENT, LABOR, ETC., ON HIGHWAY No. 8."

Then follows a list of repairs; another with respect of rental items; another under the heading of "Labor," which includes 11 men working from three hours to 45 hours; a charge for "board and room," and a further charge of "insurance $5.87 per hundred dollars, payable on pay roll plus board and room." Amongst the men listed as laborers we find the name of "C. Dahl 10 hr. @ $5.50 $5.00." It is claimed that this statement was rendered in error. Be that as it may, it has evidentiary force. It appears that Bruce was doing some work with a part of Wunderlich's equipment under a profit-sharing plan, Wunderlich furnishing the equipment and paying all expenses in respect of men and materials and Bruce being paid 25 per cent of the net profits. The commission found that the arrangement between Bruce and Wunderlich did not constitute Bruce an independent contractor but rather that he was an agent

having an interest in the subject matter of the agency. The commission concluded its memorandum as follows:

"From a careful examination of the evidence, it appears to the commission that Charles Dahl was originally hired by Martin Wunderlich through the latter's agent, William Bruce; that under the contract of rental between Wunderlich and Preston, the former was obligated to furnish the necessary help to operate the machines; that Dahl was sent to work at Preston's camp by Wunderlich's agent, pursuant to that obligation; that Dahl was not consulted about the matter and was not informed that he was working for an employer other than the one to whom he originally hired out; that he was directed to, and did report to Roy Jones, one of Wunderlich's caterpillar mechanics, who remained in charge of the equipment while it was being operated on Preston's job; that he was being paid for his work by Wunderlich; and that he was at all times subject to the control and direction of Wunderlich through the latter's agents, Bruce and Jones. We, therefore, conclude that he was in the employment of Martin Wunderlich at the time of the accident, rather than of W. E. Preston, the lessee of Wunderlich's equipment."

Each employer concedes that Dahl was injured in the course of his employment and that he should receive compensation, but disclaims his own liability, each pointing to the other as being the employer. Relator claims that the evidence so overwhelmingly sustains his position, that Preston was the employer, that the commission was in error in reaching the conclusion it did. He takes the position that Preston hired this equipment, including the men going with it, in doing this particular work and that he had charge and control of the men so that they were subject to his orders and directions and as a consequence they were his employes, not those of Wunderlich. He cites Herron v. Coolsaet Bros. 158 Minn. 522, 527, 198 N. W. 134, 136, and quotes therefrom:

"Perhaps the most important test is as to who has the right to direct, and when and how it shall be done, and who has the right to general control."

Also, C. R. Meyer & Sons Co. v. Grady, 194 Wis. 615, 217 N. W. 408, and other cases, including that of Morss v. Murphy T. & S. Co. 170 Minn. 1, 4, 211 N. W. 950, 951, and quotes therefrom as follows:

"If the employe is given over unreservedly to the service and direction of another it creates the relation of master and servant between him and the other."

Reference is also made to 39 C. J. p. 558, § 669.

Respondent Preston cites and relies upon 1 Mason Minn. St. 1927, § 4326(d), which reads:

"The term 'employer' as used herein, shall mean every person not excluded by section 8, who employs another to perform a service for hire and to whom the 'employer' directly pays wages, * * *."

Also, reliance is placed upon such cases as State ex rel. D. M. Gilmore Co. v. District Court, 147 Minn. 12, 179 N. W. 216; Arterburn v. County of Redwood, 154 Minn. 338, 191 N. W. 924; Campbell v. Connolly Contracting Co. 179 Minn. 416, 229 N. W. 561.

In cases of this nature it is sometimes difficult to determine where the line of demarcation is. In the instant case, however, it clearly appears that Wunderlich was the man with whom the employe made his contract and that he was paid for his labor by Bruce, relator's superintendent; that under the lease agreement the operators of relator's equipment were to be furnished by him; that the employe was directed regarding his work by one of relator's men, and, what seems to be even more important, the employe was not informed that he was working for anyone other than relator.

"But employment, like any other contract, presupposes understanding. The new relation cannot be thrust upon the servant without knowledge or consent. (McNamara v. Leipzig, 227 N. Y. 291, 125 N. E. 244, 8 A. L. R. 480; Standard Oil Co. v. Anderson, 212 U. S. 215, 221, 29 S. Ct. 252, 53 L. ed. 480; Hull v. Philadelphia & Reading Ry. Co. 252 U. S. 475, 40 S. Ct. 358, 64 L. ed. 670.) He must understand that he is submitting himself to the control of a new master. * * * There can be no unwitting transfer from one service to another." Murray v. Union Ry. Co. 229 N. Y. 110, 113, 127 N. E. 907.

See also Scott v. O. A. Hankinson & Co. 205 Mich. 353, 171 N. W. 489; 1 Schneider, Workmen's Compensation Law (2 ed.) § 24, p. 214. True, such contract as any other may arise by the use of words as well as by conduct, or by both, but the facts stated warrant the conclusion that Dahl was sent to the Preston camp while a servant of relator and remained such while doing the work mentioned; at least the evidence justifies such finding, and that is enough to compel affirmance of the award.

The writ is discharged and award affirmed.