CONSTANCE M. OTTEN v. UNIVERSITY HOSPITALS
AND OTHERS.
MINNEAPOLIS GENERAL HOSPITAL, RELATOR.
SANATORIUM COMMISSION OF HENNEPIN COUNTY
AND ANOTHER, RESPONDENTS.[1]

December 9, 1949.

No. 34,975.

---

[1]Reported in 40 N. W. (2d) 81.

*John F. Bonner,* City Attorney, and *Carsten L. Jacobson,* Assistant City Attorney, for relator.

*John E. Mullen,* for respondent employe.

*J. A. A. Burnquist,* Attorney General, *Victor H. Gran,* Assistant Attorney General, and *R. A. Woychik,* State Compensation Attorney, for respondent State of Minnesota, University of Minnesota, University Hospitals.

*Reynolds & McLeod,* for respondents Sanatorium Commission of Hennepin County and Associated Indemnity Corporation, insurer.

PETERSON, JUSTICE.

This proceeding brings up for review an award of compensation against the Minneapolis General Hospital.

The question for decision is:

Whether a student nurse taking nurses training at the University of Minnesota under the program of nurses training for members of the United States Cadet Nurses Corps authorized by 50 USCA Appendix, §§ 1451 to 1462, which was furnished without charge for tuition, fees, and other expenses, and who received from the university a monthly "stipend," and from affiliates, where she received practical training, board, room, and laundry, and who was at all times subject to full and final control and discipline by the university not only with respect to her conduct while pursuing classroom study at the university and taking practical training at the affiliates, but also

as to her personal conduct and deportment, was an employe of the university or of a hospital affiliate, where she contracted disease causing disability.

Constance M. Otten, the employe, contracted "clinical tuberculosis" while pursuing a course as a student nurse in the school of nursing at the University of Minnesota as a member of the United States Cadet Nurses Corps. The cadet nurses corps was authorized by 50 USCA Appendix, §§ 1451 to 1462 (commonly known as the Bolton Act), for the purpose of training nurses so as to assure a supply of nurses for the armed forces, governmental and civilian hospitals, health agencies, and war industries. The federal statute cited provides that the program of such training shall be administered by the Surgeon General of the United States. The program contemplated that the training should be done by various institutions equipped for the task. In order to participate in the program, an institution was required to submit to and obtain the approval of the Surgeon General of a plan for such training, providing, among other things, for: (a) Courses of study and training meeting standards prescribed by the Surgeon General; (b) furnishing by the institution to student nurses (without charge for tuition, fees, or other expenses) such courses of study and training, and also uniforms, insignia, and maintenance in accordance with regulations of the Surgeon General; (c) payment by the institution to the student nurses of a "stipend" of not less than $15 per month for the first nine months of study; $20 for the following 15 to 21 months of combined study and practice, depending upon the curriculum of the institution; and $30 per month thereafter until graduation; and (d) for graduation of the student nurses upon completion of their course. Institutions participating in the program were paid in advance out of federal funds amounts determined by the Surgeon General to cover: (a) Tuition and fees for the courses of study and training; (b) reasonable maintenance as provided in the plan "for the first nine months of their [the student nurses] course of study and training, to the extent that such maintenance is not compensated for by the value of their services during such period" (50 USCA

Appendix, § 1453[1][B]); (c) uniforms and insignia; and (d) the minimum "rate of stipend" mentioned. There were also administrative provisions for subsequent audit, adjustment, and refund to the treasury of any excess paid to such institutions.

The University of Minnesota participated in the program, offering a course in student nursing approved by the Surgeon General. On October 2, 1944, employe enrolled at the university for the course and commenced her training as a student nurse, which consisted of both classroom study and practical training. While the curriculum adopted by the university for the course was not made part of the record, it appears that it included classroom studies at the university and practical training in hospitals located in the Twin Cities referred to as "affiliates." Employe spent the first three months of her course (from October 2, 1944, to sometime in January 1945) in academic study at the university with some work in the university children's nursery. Thereafter, she was assigned to Minneapolis General Hospital in Minneapolis with a group consisting of about one-third of her class to receive practical training in nursing. The university at all times maintained full and final control over student nurses while they were serving in hospitals to which they were assigned. This control extended not only to seeing to it that the students had the practical training contemplated by the curriculum, but also to the reassignment of the students to other institutions for special training and the discipline of students for violation of the rules prescribed by the university while pursuing their courses. To make this control effective, the university maintained at Minneapolis General Hospital an accredited faculty member in charge of student nurses. It exercised the right of reassignment at least ten times in the case of the employe and assigned her to such other hospitals as the Miller in St. Paul, St. Mary's in Minneapolis, and the Glen Lake Sanatorium in rural Hennepin county (all affiliates under the plan), in which institutions employe received special training in such fields as surgery, gynecology, treatment of tuberculosis, and perhaps others. The university received "benefits" from giving the course for training nurses. While pursuing her

course, employe received from the university a stipend of $20 per month and, in addition, her tuition, fees, and uniforms. She received her board, room, and laundry at the various hospitals where she was given practical training.

Employe contracted clinical tuberculosis while serving either at Minneapolis General Hospital or the Glen Lake Sanatorium. The evidence is in conflict as to whether it was contracted at the one or the other. Employe became disabled on January 20, 1947, as a consequence of such disease and was still disabled on February 25, 1948, the date of the last hearing before the referee. Because she was so disabled and because as a result thereof she was unable to pursue her training as a student nurse, the university on January 31, 1947, canceled her enrollment and terminated her status as a member of the United States Cadet Nurses Corps.

It is conceded that under the rule of Judd v. Sanatorium Comm. 227 Minn. 303, 35 N. W. (2d) 430, employe was an employe within the meaning of the workmen's compensation act and entitled to compensation from her employer at the time she contracted her disease. The controversy here relates to which of the institutions—the University of Minnesota, Minneapolis General Hospital, or the Sanatorium Commission of Hennepin County (the operator of Glen Lake Sanatorium)—was her employer. The importance of a determination of the question lies in the fact that M. S. A. 176.66, subd. 5,[2] provides that where there are several employers the total compensation due for occupational disease is recoverable from the employer who last employed the employe in the employment to the nature of

---

[2]Section 176.66, subd. 5, provides in part:

"The total compensation due for occupational disease is recoverable from the employer who last employed the employee in the employment to the nature of which the disease was due and in which it was contracted. If such disease was contracted while such employee was in the employment of a prior employer, the employer who is made liable for the total compensation, as provided by this subdivision may appeal to the commission for an apportionment of such compensation among the several employers who, since the contraction of such disease, employed such employee in the employment to the nature of which such disease was due."

which the disease was due and in which it was contracted, with right of apportionment in certain cases against any prior employer. There were contentions here that Minneapolis General Hospital was such last employer; that Glen Lake Sanatorium was; and that the university was the sole employer and as such has the sole liability to pay compensation to employe.

The workmen's compensation act, so far as here material, defines an "employer" as a person who *employs* another to perform a service for hire and to whom he (the "employer") directly pays wages (§ 176.01, subd. 5); and an "employe" as a person *in the service of another* under any contract of hire (subd. 8[2]); but the statutory definitions supply no rule of thumb for determining who was the employer here, for the reason that application of the definitions to the facts of the case raise such questions as: Who employed? In whose service was the employe?

Numerous factors are considered in determining whether a person is the employer of another, and, as between two or more persons alleged to be the employer, which one is in fact such. Among the factors generally considered as decisive are hiring, payment of compensation, furnishing of materials or tools, control of the premises where the work is done, the right to hire and fire, and authoritative right to control the means and manner of performance of the work. Oestreich v. Lakeside Cemetery Assn. 229 Minn. 209, 38 N. W. (2d) 193; Gill v. Northwest Airlines, Inc. 228 Minn. 164, 36 N. W. (2d) 785; Korthuis v. Soderling & Sons, 218 Minn. 342, 16 N. W. (2d) 285; Lemkuhl v. Clark, 209 Minn. 276, 296 N. W. 28; 6 Dunnell, Dig. & Supp. § 10395. The right alone to fire, as we said in Nesseth v. Skelly Oil Co. 176 Minn. 373, 376, 223 N. W. 608, 609, "affords adequate means for control."

The relation of employer and employe, and consequently the former's liability to the latter, is not terminated by the mere fact that the employe by the employer's direction or with his consent renders services to a third person. In such a situation, the employer-employe relation is not terminated unless the employer surrenders to such third person *all* control over the employe; and a

partial surrender by the employer of control so as to place the employe under only *partial* control of the third person, while the services are being rendered, will not suffice. O'Rourke v. Percy Vittum Co. 166 Minn. 251, 207 N. W. 636; Ramsey v. New York Cent. R. Co. 269 N. Y. 219, 199 N. E. 65, 102 A. L. R. 511. As said in the O'Rourke case (166 Minn. 257, 207 N. W. 638) :

"Where an employe performs services for a third party by direction of his employer, if the relation of employer and employe continues to exist between them during the performance of such services, the employer is liable under the compensation act for injuries sustained by the employe while performing the task so assigned to him, although he may be under the control of the third party as to the details of the work."

We applied the rule in determining as between a hospital and a patient whether a nurse assisting a surgeon in the performance of an operation is the employe of the hospital or of the surgeon. Wallstedt v. Swedish Hospital, 220 Minn. 274, 19 N. W. (2d) 426; St. Paul-Mercury Ind. Co. v. St. Joseph's Hospital, 212 Minn. 558, 4 N. W. (2d) 637.

As applied here, some of the factors mentioned are lacking, viz.: Furnishing of tools and control of the premises where the services were rendered. Present here are such factors as hiring, furnishing of materials and equipment, the right to hire and fire, and authoritative right to control the means and manner of performance of the services rendered. These, under the authorities cited, as a matter of law, compel the conclusion that the university was the employer. So far as the enrollment and curriculum for student nurses training provided for the rendition of services by the student nurses and receipt by them of board, room, and laundry and a fixed monthly "stipend," they constituted a hiring of the student nurses and the payment of wages for services rendered. We held in the Judd case, 227 Minn. 303, 35 N. W. (2d) 430, *supra,* that a student dietitian at the University of Minnesota, enrolled under similar circumstances under an arrangement whereby she was to receive board, room, and

laundry (but not a "stipend") while rendering services, was an employe within the meaning of the workmen's compensation act: The instant case is a stronger one for holding that the student nurse here is an employe, which, as has been pointed out, is conceded, because, in addition to the presence here of the factors present in the Judd case, the student nurse here was entitled to a monthly "stipend." The "stipend," which the university was required under the federal statute to pay student nurses, was the equivalent of wages payable in cash. While the meaning of the word "stipend," like that of others, is governed by the context and other factors shedding light on the question (see, In re Farwell's Estate, 306 Mich. 208, 10 N. W. [2d] 830; In re Klinger's Estate, 17 Pa. Dist. 126), it means wages, salary, or the equivalent thereof, where, as here, the context shows that it refers to something given as compensation for services. Reynolds v. Reynolds, 14 Cal. App. (2d) 481, 58 P. (2d) 660; Bovard v. Ford, 83 Mo. App. 498; Mangam v. City of Brooklyn, 98 N. Y. 585, 50 Am. R. 705; 40 Wd. & Phr. (Perm. ed.) Stipend, pp. 154, 155; 60 C. J., Stipend, p. 34. It is plain that the provisions of the federal statute (§ 1453[1][B]) for the reimbursement of a participating institution for maintenance of student nurses during the first nine months "to the extent that such maintenance is not compensated for by the value of their [student nurses] services during such period" regard the services rendered by student nurses not only as having value, but also as a *quid pro quo* for their maintenance to the extent at least of their value.

The university not only entered into what, as we have pointed out, constituted an arrangement for the hiring of the employe for wages, and thus created an employer-employe relation, but it also established the right of full control and supervision over employe, both while she was at the university and while she was at affiliates receiving practical training, which it at all times effectively exercised as to minute details through an accredited member of the university's nursing faculty present at the affiliate (Minneapolis General Hospital) for the purpose. This control extended not only to the rendition of services by student nurses, but also to their personal

conduct and deportment while not so engaged. The university at no time surrendered or relinquished authoritative control over the employe. Furthermore, the university had the right to terminate the student nurse's status as a member of the United States Nurses Cadet Corps. This, as has been pointed out, is an effective means of control. When the employe became incapacitated by disease, the university exercised this power by terminating the employe's training as a student nurse.

The Judd case, *supra*, does not hold contra, as the university contends; but rather fully supports the views here stated. There, we held that the relation of employer and employe existed between a hospital and a student dietitian employed by it who rendered services in the course of her training, and that, as between alleged employers, the one having the right of authoritative control was in fact the employer. Applying these rules, we held that the employe there not only entered into a contract with the hospital where she was receiving training for employment there, but also that (227 Minn. 307, 35 N. W. [2d] 434): "It [the sanatorium] also had exclusive control and direction over the manner and means by which this work was to be performed while she was at the institution." There, unlike the instant case, the university asserted no right of control and did not attempt to exercise any. It had no representative at the sanatorium to make effective any alleged right of control, as it did here at its affiliates. There, the university surrendered complete control over the student dietitian, who in turn placed herself under the control of the sanatorium where she rendered services. The factors mentioned differentiate the Judd case from the instant one and there compelled a different result, although applying the same rules of decision.

Our conclusion is that the University of Minnesota was the sole employer of the employe and that she is entitled to recover compensation only from it. Consequently, the award against Minneapolis General Hospital must be and is set aside; and the case is remanded with directions to make a new award in favor of employe against the University of Minnesota for such compensation as

she is entitled to. This should be done forthwith, for the reason that payment of compensation to employe has already been delayed long enough (the claim petition was filed on June 6, 1947, and the referee's findings were filed on April 26, 1948).

Award set aside and case remanded with directions to make a new award in accordance with the opinion.

