## DONALD PETSCHOW v. EMIL SCHEID, d.b.a. SCHEID PLUMBING & HEATING, AND OTHERS. HILL HEATING & ROOFING, INC., AND ANOTHER, RESPONDENTS.

108 N. W. (2d) 1.

March 3, 1961—No. 38,148.

*Robb, Robb & Van Eps,* for relators.
*McLeod & Gilmore,* for respondents.

KNUTSON, JUSTICE.

Certiorari to review a decision of the Industrial Commission determining liability for workmen's compensation as between two employers.

Donald Petschow was employed by Emil Scheid on November 6, 1956. Shortly thereafter he became a sheet-metal apprentice in Scheid's employ.

Sometime prior to September 1957, Scheid entered into a contract to do the sheet-metal work on a building project in Austin, Minnesota. He thereafter sold this contract to Hill Heating & Roofing, Inc., referred to hereinafter as Hill. Work was commenced on the project in September 1957 and it was completed in June 1958.

Petschow continued to work for Scheid until the latter part of

February 1958. At that time his name and that of another Scheid employee appeared on a posted work list as being assigned to the "Hill job." He was aware at that time that he would be working as a sheet-metal worker under the supervision of Hill's foreman, Floyd Johnson. He testified that he had no objection to being so assigned and that he consented to it. Petschow had no knowledge of the arrangement between Hill and Scheid. He was paid $2 per hour to begin with, which later was raised to $2.45, and, while there was no discussion of what pay he was to receive while working for Hill, it was understood that he was to receive the same pay as while working for Scheid. It appears that he was willing to work on any job Scheid assigned him to. He kept his own time, and he never discussed the rate of pay with Hill but turned in his time to Scheid each Friday and received his pay by check from Scheid, who thereafter was reimbursed in full by Hill. Scheid deducted withholding and social security taxes from the earned wages and did all the bookkeeping.

Petschow continued working for Hill until about June 1, 1958. During April of that year he sustained two compensable injuries. However, he continued to work, and, when this job was completed, he went back to work for Scheid for about 2 weeks, after which he was again assigned to another Hill job.

Employee has been compensated in full. The only question here is which of the two employers is liable for compensation payments. The Industrial Commission determined that Scheid was so liable.

The case involves liability for workmen's compensation to a loaned servant as between the original and a special employer. We have had occasion to consider this question on many occasions,[1] and, while fairly definite rules have evolved from the consideration of these cases, application of the rules to given facts is not always free from doubt, since the facts of one case are seldom identical with those of another. Thus, the cases involving student nurses[2] are of little help

---

[1]Cf. Turner v. Schumacher Motor Express, Inc. 230 Minn. 172, 41 N. W. (2d) 182.

[2]See, for instance, Krause v. Trustees of Hamline University, 243 Minn. 416, 68 N. W. (2d) 124; Otten v. University Hospitals, 229 Minn. 488, 40 N. W. (2d) 81.

where the employee occupies a different status. In the application of established rules of this kind, each case must be controlled by its own facts.[3]

In the student-nurse cases, while the student was receiving part of her training in a hospital affiliate of the institution with which she was registered for training she contracted a compensable disease, but the institution originally responsible for her training retained the primary responsibility of supervision and control over her activities, and it was held that such original institution only was liable for compensation. The work done for the hospital in which the disease was contracted was only incidental to the main educational program. At the other extreme are those cases where the original employer surrenders completely any control over the employee. When that is done, with the consent, express or implied, of the employee, there is no difficulty. In between, however, lies a type of case where determination must rest on the peculiar facts of each case.[4]

An attempt has been made here to equate an apprentice to a student nurse. It would seem that the term "apprentice" here is used more for the purpose of classification of the employee for wage determination than to fix a status as a true apprentice. Our Workmen's Compensation Act makes specific provision for an employee who is in fact an apprentice (Minn. St. 176.101, subd. 7), apparently recognizing that apprentices usually work for low wages and that it is difficult to fix the value of such services.

In Judd v. Sanatorium Comm. 227 Minn. 303, 310, 35 N. W. (2d) 430, 435, we quote with approval the following from Heget v. Christ Hospital, 26 N. J. Misc. 189, 191, 58 A. (2d) 615, 616:

"After a careful consideration of the record in this case it is my opinion that the status of a student nurse who renders service to the public and to the respondent hospital for the pecuniary gain of the

---

[3]Ledoux v. Joncas, 163 Minn. 498, 204 N. W. 635; Campbell v. Connolly Contracting Co. 179 Minn. 416, 229 N. W. 561; Darvell v. Paul A. Laurence Co. 239 Minn. 55, 57 N. W. (2d) 831.

[4]See, for instance, Judd v. Sanatorium Comm. 227 Minn. 303, 35 N. W. (2d) 430.

latter is very similar to the old time apprentice. While all of the attributes and legal consequences of an apprenticeship relation are not present here, most of them are. In Black's Law Dictionary (third edition) page 129, an apprentice is defined as 'a person, usually a minor, bound in due form of law to a master, to learn from him his art, trade or business, and to serve him during the time of his apprenticeship,' Lyon v. Whitemore, 3 N. J. L. 845. Thus, the apprentice rendered services to his master in some trade or employment with the primary purpose of learning the trade, business or profession of the master. *The apprentice usually received no remuneration for his services outside of his board and lodging.* Stokes v. Hatcher, 4 Id. 84. For services rendered by him, no doubt the master received payment from the public, Bedford v. Newark Machine Co., 16 N. J. Eq. 117." (Italics supplied.)

Here the employee was paid $2 per hour to begin with, which later was increased to $2.45 per hour. It can hardly be said under those circumstances that learning a trade was the primary purpose of the employment. Learning a trade, or advancing step by step in it from apprentice to journeyman to master, is incidental to most employments. In the absence of more definite proof as to the nature of the apprenticeship than we have in this case, it seems unlikely that the term "apprentice" as used here implies a status similar to that of a student nurse.

It is elementary that the primary essential of a master-servant relationship is a contract of hire, either express or implied.[5] That no express contract existed here between Petschow and Hill is evident. That an express contract did originally exist between Petschow and Scheid is equally evident. To find Hill liable, we must then find an implied contract between Petschow and Hill which, with the consent of the employee, temporarily replaced the original contract with Scheid. What seems to be a consent of the employee may sometimes amount to no more than obedience to a master's command to do work for another

---

[5]Pocrnich v. Snyder Min. Co. 233 Minn. 81, 45 N. W. (2d) 794; 1 Larson, Workmen's Compensation Law, § 48.

temporarily. In Rhinelander Paper Co. v. Industrial Comm. 206 Wis. 215, 217, 239 N. W. 412, 413, the Wisconsin court said:

"\* \* \* Where an employee enters the service of another at the command and pursuant to the direction of the master, no new relationship is created. While the employee may be subject to the direction of the temporary master, he is there in obedience to the command of his employer, and in doing what the new master directs him to do he is performing his duty to the employer who gave the order."

In Otten v. University Hospitals, 229 Minn. 488, 493, 40 N. W. (2d) 81, 85, we said:

"The relation of employer and employe, and consequently the former's liability to the latter, is not terminated by the mere fact that the employe by the employer's direction or with his consent renders services to a third person. In such a situation, the employer-employe relation is not terminated unless the employer surrenders to such third person *all* control over the employe; and a partial surrender by the employer of control so as to place the employe under only *partial* control of the third person, while the services are being rendered, will not suffice."[6]

Thus, the tests we have heretofore announced are again only guideposts rather than hitching posts. The ultimate question, after applying the tests to the facts of a case, is whether a new contractual relationship of employer and employee has been created, with the consent, express or implied, of the contracting parties.[7] Whether that relationship exists presents a question of fact. Here the usual rule applies that if the evidence reasonably sustains the findings of the commission we will not reverse.

There is sufficient evidence in this case to sustain a finding that Petschow remained the employee of Scheid and that his work for Hill, even though with his consent, was merely in obedience to his master's command. Petschow had no discussion with Hill regarding

---

[6]See, 1 Larson, Workmen's Compensation Law, § 48.10, p. 712.

[7]Dahl v. Wunderlich, 194 Minn. 35, 259 N. W. 399; Yoselowitz v. Peoples Bakery, Inc. 201 Minn. 600, 277 N. W. 221.

wages, terms or conditions of employment, or how long he would continue to work for him. He returned to Scheid when the work was finished. He reported his time and received his pay from Scheid. The pay was according to his contract with Scheid. He again returned to Hill when Scheid directed him to do so. While none of these facts are conclusive, they do permit an inference that Petschow remained the employee of Scheid. That being true, the first essential in creating a master-servant relationship is missing; hence, we need go no farther.

Affirmed.