**Rosa Lena HART and Harry Hart, Respondents,**

v.

**James C. STEELE, Appellant.**

No. 52549.

Supreme Court of Missouri, Division No. 1.

July 10, 1967.

Harold W. Barrick, New London, for respondents.

Carstarphen, Harvey & Wasinger, Hannibal, for appellant.

HOUSER, Commissioner.

Rosa Lena Hart and her husband Harry brought a malpractice action against Dr. James C. Steele, a surgeon. Following a jury verdict for defendant the court, considering that it had improperly excluded certain evidence offered by plaintiffs, sustained plaintiffs' motion for a new trial. Defendant appealed.

The parties have joined issue on the question of the admissibility of the excluded evidence but before reaching that point we consider first appellant's point of chief insistence, that the trial court erred in failing to direct a verdict in his favor; that plaintiffs not only failed to make a submissible case but also affirmatively disproved their own case.

The negligence charged was that of puncturing Mrs. Hart's left kidney tube (ureter) in the course of a hysterectomy.

After the operation Mrs. Hart experienced a normal postoperative recovery for several days. Her temperature and abdominal distention subsided and she was recovering until eleven days after the operation, when her temperature elevated and her abdomen began to swell. Dr. Strong was called in consultation on the twelfth day and Dr. Clisham was called in on the thirteenth day. Mrs. Hart by then was acutely ill. Dr. Strong's first impression was that she had either a wound abscess or a uretal opening or injury with possible extravasation of urine. After doing a retrograde pyelogram and taking X rays, a diagnosis of defect in the ureteral wall was made, and a second operation was decided upon. There is no question that after the hysterectomy was performed a fistula or opening in the ureter either existed or developed, through which urine escaped into the abdomen, necessitating the second operation. Dr. Clisham assisted Dr. Steele in performing the second operation, draining accumulated urine and inserting a catheter. Following the second operation the fistula healed and Mrs. Hart experienced a normal recovery.

Plaintiffs' theory was that in suturing during the hysterectomy defendant negligently put a stitch in the ureter. They introduced a hospital record written by a doctor, an X-ray technician, which stated "Apparently there has been an injury to the ureter at the time of surgery." Plaintiffs' only evidence that defendant put a stitch in the kidney tube came from plaintiff Harry Hart and Mrs. Hart's parents, who testified that in their presence defendant stated that he "had a stitch in the kidney tube and would have to operate," and Mrs. Hart's testimony that during the pyelogram procedure she overheard Dr. Clisham say to Dr. Steele, "Jim, here is your trouble. You've got a stitch in the kidney tube."

Plaintiffs called Dr. Steele to the stand. He described Mrs. Hart's condition and symptoms before the operation; the operation itself, which was "perfectly normal," and stated that he had performed in excess of 300 hysterectomies, in none of which the patient developed an opening in the kidney tube and in none of which he ever passed a

suture through the kidney tube. It was his opinion that the opening in the kidney tube was caused by a rare complication of her disease of endometriosis; that when the ovaries are removed and the hormones are thus withdrawn this causes a wasting of the tissues and the formation of scar tissue which may involve a blood vessel to the ureter, and that this results in death (necrosis) of the tissue in the wall of the ureter which would then cause a fistulous opening. He stated that if she had had an opening in the kidney tube at the time of the first surgery she would have developed her trouble immediately, but her troubles did not start until the eleventh day after the operation, which would be about the usual length of time for a fistula to develop if caused by the drying up of endometriosis implants.

Plaintiffs called Drs. Strong and Clisham to the stand as their witnesses. These doctors did not support but contradicted plaintiffs' theory of the case. Dr. Strong testified positively that "there wasn't a stitch put through this one." These two doctors testified that the fistula was caused by a necrosis of the wall of the ureter, which they explained as follows: Mrs. Hart was suffering from endometriosis, which is a condition in which tissue shed during the menstrual cycle regurgitates or passes out through the Fallopian tubes and scatters throughout the abdomen. Fed by hormones from the ovaries these little implants increase in size and cause pain. A hysterectomy is an accepted method of treating and curing endometriosis. When the ovaries are removed, thereby cutting off the supply of hormones, the implants decrease in size or "dry up," forming scar tissue in the process. Ordinarily this does not cause trouble but in Mrs. Hart's case a rare complication occurred, in that the scar tissue interfered with the blood supply to the ureter, causing necrosis of the wall of the ureter, resulting in the fistula. Both of these doctors were also of the opinion that the fistula could have been caused by the diminishing of the blood supply to the ureter,

causing necrosis, occurring as a natural and normal consequence of the hysterectomy.

Plaintiffs also called a Dr. Dwyer to the stand. On the basis of hypothetical questioning, he was of the opinion that the hole in the ureter was not due to endometriosis. In answer to a hypothetical question which assumed that in suturing the patient a stitch was passed through the kidney tube Dr. Dwyer gave his opinion that the stitch would account for the escape of urine into the abdominal cavity.

Defendant's case in chief consisted of his own testimony and that of Dr. Burns, who assisted Dr. Steele in the performance of the hysterectomy. Dr. Burns confirmed the opinions of Drs. Steele, Clisham and Strong that the fistula was caused by necrosis resulting from interference with the blood supply due to scar tissue and shrinking up or atrophy of the implants. As he explained it, atrophy interferes with blood supply, necrosis sets in, the wall becomes soft and jellylike and a leak develops much like a soft spot in a garden hose will give way. Dr. Burns also confirmed their view that necrosis could be caused by the disturbance of the blood supply as a natural result of surgery. He categorically and positively denied that a stitch had been passed through the ureter and testified that if it had the patient would not have continued to improve for several days after surgery, but would have remained sick, her temperature would have continued to be elevated and her abdomen would have continued to be distended. The fact is, however, that she got better after the hysterectomy, her temperature became normal, and the postoperative distention of her abdomen went away. It was not until eleven days after the first operation that these symptoms returned. He testified that it would take from 7 to 14 days after surgery for the fistula to develop by the cutting off of the hormone supply. Dr. Burns testified that the surgery was performed in a good manner, a "very meticulous manner"; that it was a routine hysterectomy; that "even the best gynecologic surgeons can put a stitch through the ure-

ter." When Dr. Steele took the stand in his own behalf he denied having made the admissions testified to by Harry Hart and Mrs. Hart's parents; denied that Dr. Clisham had made the statement attributed to him, and denied that he had placed a stitch through the ureter. He testified that if he had done so it would have caused a fistula; that leakage would have developed within 24 to 48 hours and the patient would have become ill immediately following the first operation; would have gotten worse instead of better; her temperature would have stayed up, and the postoperative distention would not have subsided. Asked whether, in case a stitch had been placed in the kidney tube, the surgery would have been below the level of skill which he as a gynecologist is expected to bring to an operation such as a hysterectomy he answered in the negative, stating that frequently ureters are damaged, and stitches placed by the most skillful gynecologists.

 Defendant was required to use and exercise that degree of care, skill and proficiency which is commonly exercised by the ordinarily careful, skillful and prudent surgeon engaged in similar practice under the same or similar conditions. If a surgeon possesses the requisite skill and exercises the requisite degree of care he is not liable in a malpractice action for an honest mistake, and having so acted is not liable merely because of an unexpected or bad result. In an action for malpractice based on specific negligence no presumption of negligence is indulged in by reason of an adverse result from medical treatment. Plaintiff has the burden of establishing negligence on the part of the surgeon. These elementary principles were reviewed in Fisher v. Wilkinson, Mo.Sup., 382 S.W.2d 627; Rauschelbach v. Benincasa, Mo.Sup., 372 S.W.2d 120; Williams v. Chamberlain, Mo.Sup., 316 S.W.2d 505, and Mann v. Grim-Smith Hospital & Clinic, 347 Mo. 348, 147 S.W.2d 606.

 To make a submissible case of negligence in this case plaintiff had the burden of establishing (1) that defendant placed a stitch in the ureter; (2) that placing a stitch in a ureter in the course of a hysterectomy constituted a failure to exercise that degree of care, skill and proficiency which is commonly exercised by the ordinarily careful, skillful and prudent gynecologic surgeon under the same or similar conditions, and (3) that the placing of the stitch in the ureter caused the extravasation of urine with its injurious consequences.

 The testimony of Mrs. Hart's husband and parents, that defendant told them he had a stitch in the kidney tube, was sufficient evidence to warrant submission of element (1) above. Hague v. Threadgill, Mo.App., 236 S.W. 895 [3]; Stratton v. Barnum, Mo.App., 263 S.W. 476 [3]; Dees v. Pace, 118 Cal.App.2d 284, 257 P.2d 756.

 There was no evidence, however, to warrant the submission of element (2) above. Plaintiff offered no expert medical testimony on the question whether the act of placing a stitch in the ureter in the course of a hysterectomy would constitute a failure on the part of the defendant to measure up to the standard of care required of gynecologic surgeons. In the great majority of malpractice cases "a submissible case may only be made by expert medical testimony for otherwise a jury may not know (or guess) whether the defendant's acts did or did not conform to the required standards. Pedigo v. Roseberry, 340 Mo. 724, 102 S.W.2d 600; McDonald v. Crider, Mo.App., 272 S.W. 980; Hopkins v. United States, D.C.W.D.Mo., 152 F.Supp. 473. In the case last cited the court said in part, loc. cit. 476, 477: 'A plaintiff in a malpractice action assumes a very heavy burden where the basis of recovery is predicated on an attack on the technique and skill exercised by an operating surgeon or on a charge that he failed to exercise reasonable judgment. In the absence of most unusual circumstances it is a burden that cannot be discharged in normal course by lay testimony. * * * When plaintiff fails to

show by calling an expert that the care given by defendant and its agents falls below the required standard of the school of medicine to which he belongs, and fails to show that Dr. Brackett neglected to use standards of skill and treatment required of others in the area, then plaintiff has failed in her burden.' The cases where a physician or surgeon has left foreign objects in operative cavities fall into an entirely different class. See: Null v. Stewart, Mo., 78 S.W.2d 75; Sontag v. Ude, 191 Mo.App. 617, 177 S.W. 659 (both cited by plaintiff); Hilton v. Mudd, Mo.App., 174 S.W.2d 31; Ingram v. Poston, Mo.App., 260 S.W. 773; Johnston v. Rodis, D.C.D.C., 151 F.Supp. 345. There, proof of such fact alone is generally held to establish a prima facie case of negligence, and the defendant is put upon his proof, although negligence is still the ultimate test. Hilton v. Mudd, Mo.App., 174 S.W.2d 31." Williams v. Chamberlain, Mo.Sup., 316 S.W.2d 505, 511; Fisher v. Wilkinson, supra, 382 S.W.2d l. c. 631, and authorities cited.

This rule is applicable in this particular type of malpractice case. In Brear v. Sweet, et al., 155 Wash. 474, 284 P. 803, a surgeon who removed a uterus was charged with negligently cutting the patent's bladder during the operation, making a hole which caused leakage. Plaintiff testified that after the operation the surgeon admitted to her that he had "cut the bladder," but offered no medical testimony on the question. The court upheld a judgment for defendant notwithstanding the verdict for plaintiff, saying, 284 P., l. c. 804 [2]: "The law is well settled that facts such as these relating to difficult operations call for knowledge far beyond the ordinary layman, and that resort must be had to the testimony of expert witnesses for light on the question whether or not the respondent has been guilty of negligence. [Citing cases.]"

In Modrzynski v. Lust, Ohio App., 88 N.E.2d 76, a surgeon who performed a hysterectomy was charged with negligently puncturing the bladder during the operation, causing a fistula and leakage. Plaintiffs, husband and wife, both testified that the surgeon admitted to them "I nipped her bladder," but they offered no medical evidence in support of their theory of the case. The court held that it was the duty of the trial court to grant defendant's motion for judgment, saying, 88 N.E.2d, l. c. 77: "By the great weight of authority, when the physician's want of skill or lack of care in the treatment of a patient or in conducting a major operation is in question, expert medical testimony is necessary to establish the claimed negligence of the physician and that such negligence has some causal connection with the claimed injury. What is, or is not standard practice and treatment in a particular case, or whether the conduct of the physician measures up to the standard is a question for experts and can be established only by their testimony.

"The only exception to such rule is that where the want of skill or lack of care is so apparent as to be within the comprehension of laymen and requires only common knowledge and experience to understand and judge it, expert evidence is not essential."

In Lince v. Monson, 363 Mich. 135, 108 N.W.2d 845, defendant surgeon operated for the removal of an ovary, and later operated for lysis of bowel adhesions. Endometriosis was encountered. Apparently a catgut suture was stitched in the ureter. There was "no medical testimony that defendants' treatment and handling of the case was not in accord with standard and usual practice of skilled doctors in the community." The court held that "the ordinary layman is not equipped by common knowledge and experience to judge of the skill and competence of that service and determine whether it squares with the standard of such professional practice in the community. For that, the aid of expert testimony from those learned in the profession involved is required." 108 N.W.2d l. c. 847. And see Siverson v. Weber, 57 A.C. 881, 22 Cal.Rptr. 337, 372 P.2d 97.

■ Even where an operation is simple a plaintiff is required to "offer expert testimony that the procedure followed constituted a failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendant's profession in good standing practicing in similar localities * * * in order to make a submissible case." Aiken v. Clary, Mo.Sup., 396 S.W.2d 668, 675. The requirement is not to be relaxed in the case of a major operation such as a hysterectomy, which is a complicated procedure of a highly technical nature. The necessity of stitching in the area of the ureters, their proximity to the organs directly involved, the difficulty of seeing the organs, the methods of avoiding such an eventuality, the likelihood of accidentally taking a stitch in the ureter in the course of a hysterectomy, etc. are not matters on which lay jurors are informed or knowledgeable. Whether the inadvertent taking of a stitch in a ureter in the course of such an operation is careless is not a matter that is so apparent as to be within the ability of the average layman to decide. In such case highly trained medical experts, knowledgeable in the field of gynecology, are needed to aid the jury in reaching a conclusion on whether this would violate the standards expected of ordinarily careful, skillful and prudent gynecologic surgeons operating under similar conditions. As stated in Lince v. Monson, supra, "Careless professional practice must not be made immune from redress at law. This is imperative for the protection of the public. That same consideration, however, dictates that no legal barriers be erected against a doctor's proceeding, in emergency or otherwise, or his judgment directs and skills permit, for saving the life or health of the patient, without fear that his professional judgment and action shall be subjected to the test of unlearned lay judgment without the guidance of professional testimony as to compliance with professional standards and practice in the communty." 108 N.W.2d, l. c. 849 [6, 7].

For failure to introduce evidence in support of element (2) above there was a failure of proof and the court should have directed a verdict for defendant. In this situation we need not discuss the third element or explore the procedural questions which have been raised and briefed. The order granting a new trial is reversed and the cause is remanded with directions to enter judgment for defendant.

WELBORN and HIGGINS, CC., concur.

PER CURIAM: The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

HENLEY, P. J., and HOLMAN, J., concur.

SEILER, J., dubitante.

STORCKMAN, J., not sitting when cause was submitted.