**Eugene CEBULA, Plaintiff-Appellant,**

v.

**Hector W. BENOIT, Jr., M.D.,**
**Defendant-Respondent.**

**No. WD 33664.**

Missouri Court of Appeals,
Western District.

May 17, 1983.

Dean F. Arnold (argued), L.D. Mayo, Jr., Kansas City, for plaintiff-appellant.

Gail L. Fredrick (argued), Freeman, Fredrick, Bennett & Rogers, P.C., Springfield, for defendant-respondent.

Before PRITCHARD, P.J., and DIXON and NUGENT, JJ.

NUGENT, Judge.

Plaintiff appeals from a judgment directing a verdict in defendant's favor at the close of plaintiff's evidence in this medical malpractice case resulting from the loss of a

needle fragment in plaintiff's chest during surgery. Plaintiff argues that the trial court erred in directing a verdict because substantial evidence existed from which a jury could have returned a verdict in his favor even absent expert medical testimony, and that the court erred in ruling that a registered nurse was not competent to testify to standard medical practice as to the removal of foreign objects from a patient's body. We affirm.

At trial, plaintiff presented three witnesses: the defendant, Dr. Benoit; the plaintiff, Mr. Cebula; and a registered nurse, Gail Ann Scott.

Dr. Benoit testified that he is a thoracic surgeon and has performed five to six thousand thoracotomies (open chest procedures). He operated on the plaintiff on January 4, 1979, to remove a partially solid, partially cystic benign tumor of the thymus gland. In doing so, he made a 10″ midline chest incision, split the sternum (chest bone), and removed the tumor with little difficulty. Following the removal, he began to pull the sternum back into place by stitching the two halves together with wire sutures, using wire to which an extremely sharp needle was secured as an extension of the suture.

Shortly after he began stitching, Dr. Benoit realized that the needle point had broken, leaving him with only half a needle. Concerned that the point may have fallen into the chest cavity, he lifted an edge of the sternum and examined the cavity both visually and by feel. He called for a magnet to be brought into the operating room to search for the needle fragment on the floor. The search was unproductive.

Dr. Benoit "was convinced that if it were in the patient, and I did not know for sure that it was, that it was absolutely not in any area where it could possibly do this patient any harm." Nevertheless, he felt that "we ought to have a chest x-ray for sure." Although it would have been physically possible to x-ray Mr. Cebula's chest in the operating room with a portable x-ray machine, Dr. Benoit decided against the procedure while the chest cavity was still

open. He testified that he reached this decision "because this man's front of his chest was laid wide open and to introduce an x-ray machine which is not sterile, even though we might protect the chest wall, I was afraid that there would be an increased possibility of getting an infection in this man's chest."

Dr. Benoit further testified that he considered opening up the patient's chest wall further to make a diligent search for the needle, but rejected that alternative as well. He did so because "to go back would involve another incision, disrupting the two previously sutured together segments of sternum ... render[ing] it unstable." The already existing incision "wouldn't permit any exploration unless I divided it in order to get between the ribs to find it [the needle], and it would have been a matter of just chewing up this man's chest wall for no real gain. I was thoroughly aware of this when I made the decision to close his chest wall without knowing for sure where the needle was."

Dr. Benoit finished suturing the sternum and following the operation, x-rayed the chest. The needle was clearly visible directly behind one of the wire sutures.

Dr. Benoit testified that he did not inform Mr. Cebula of the presence of the needle during his hospital stay, because he did not wish to upset him. Mrs. Cebula was informed immediately following surgery and told not to be concerned.

On January 26, 1979, three weeks after the operation, Dr. Benoit informed Mr. Cebula of the needle in his chest during a post-operative visit. The patient record on that date showed that the doctor noted, "I predict it [the needle] will cause no trouble any more than his transsternal wires will." Although Mr. Cebula complained at that visit of discomfort and difficulty sleeping, Dr. Benoit testified that such complaints are not unusual for chest surgery patients.

On February 16, 1979, the patient record showed that Mr. Cebula was much better, but "remains very apprehensive about his mild discomforts." The patient also report-

ed a new symptom, postural hypotension (dizzy feelings following a sudden change in position), said by the doctor not to be unusual in people over fifty-five.

On May 18, 1979, the patient record showed that Mr. Cebula had local wound complaints thought by the doctor to be "of no significance." Dr. Benoit noted, "I think he is well."

On January 1, 1980, Mr. Cebula was diagnosed by Dr. Benoit as "totally asymptomatic" with no complaints. New x-rays indicated that the needle was not migrating through the body.

The doctor testified that, in his opinion, the needle would not migrate first, because "there is no real motion in this portion of the body," second, because the needle's curvature made it unlikely that it would move in a straight line, and third, because the x-rays showed that the lower wire around the sternum encompassed the needle, anchoring it in place.

Finally, Dr. Benoit testified that it was possible that the presence of the needle could cause a mental reaction, disturbing Mr. Cebula "in spite of all the reassurance he was given."

The plaintiff, Mr. Cebula, testified that the needle in his chest did not hurt, and that as long as he kept busy it did not bother him. Although he experiences no pain, he stated that he feels uncomfortable in one spot. His major complaint was that "it still bugs me today," causing him to wake up at night thinking about it, and keeping him awake for an hour and a half or more.

In spite of an "uneasy, queasy feeling", Mr. Cebula worked in the same capacity both before and after the operation as a merchandising manager for Sears, felt undisturbed about the needle as long as his mind was occupied, and continued to be able to play golf and mow the lawn.

Plaintiff's final witness was Gail Ann Scott. She testified that she was a registered nurse and had completed her nurse's training in 1976. She was employed at Shawnee Mission Medical Center in the intensive and coronary care department, with some surgical experience as both a circulating nurse and a scrub nurse. She had observed several chest operations.

Plaintiff's counsel asked Ms. Scott, "Is there any accepted medical practice in the medical profession to remove a foreign body from the chest cavity?" Defendant objected on the basis that she was not competent to testify concerning the procedure.

Plaintiff then made an offer of proof in which Ms. Scott answered the same question, "Yes," and stated, "I can't imagine a case where you would permit a needle to stay in once you know its there." She further stated that orthopedic surgeons commonly use x-ray machines in surgery using certain techniques to avoid infection, such as sterile toweling over the area or plastic drapes over the machine.

Following the offer of proof, the court sustained the objection to Ms. Scott's competence as an expert but permitted her to testify that she had observed the use of x-ray machines in both orthopedic and abdominal surgery. On cross, she testified that she had no training in chest surgery and had never assisted in surgery where the sternum was split.

At the close of plaintiff's evidence, defendant moved for a directed verdict. The court stated that the plaintiff was asking the jury to speculate as to whether other surgeons under the same circumstances would or would not remove a broken end of a needle, and granted the motion.

On appeal, plaintiff argues (1) that the trial court erred in directing the verdict because expert medical testimony is not required in cases where foreign objects are left in operative cavities and (2) that even if expert testimony is required, the offered testimony of nurse Gail Ann Scott would have adequately provided that testimony.

We note first that in reviewing the granting of a motion for directed verdict at the close of plaintiff's evidence, we must consider whether plaintiff has presented substantial evidence sufficient to require submission to the jury. In doing so, we

view the evidence most favorable to plaintiff and indulge all reasonable inferences to be drawn in his favor. *Kaelin v. Nuelle,* 537 S.W.2d 226 (Mo.App.1976).

In a medical malpractice case, plaintiff must present sufficient evidence to establish first, a causal connection between the act or omission of the physician and the claimed injury, second, proof that the act or omission was negligently performed, and third, proof that the physician failed to meet the requisite medical standard of care. *Langton v. Brown,* 591 S.W.2d 84 (Mo.App. 1979).

The standard of care has been defined as "that degree of care, skill and proficiency which is commonly exercised by the ordinarily careful, skillful and prudent surgeon engaged in similar practice under the same or similar conditions." *Hart v. Steele,* 416 S.W.2d 927 (Mo.1967). *See also Gridley v. Johnson,* 476 S.W.2d 475 (Mo. 1972), and MAI 11.06.

The general rule is that where the exercise of the proper degree of care and skill of a physician is at issue, expert medical testimony is essential. *Langton v. Brown, supra,* at 88; *Hart v. Steele, supra,* at 931; *Morgan v. Rosenberg,* 370 S.W.2d 685, 693 (Mo.App.1963). The rationale for this rule is that absent guidance on issues requiring specialized knowledge beyond that common to laymen, "juries will be cast into a river of doubt and must establish an arbitrary standard of their own founded upon conjecture and surmise in their effort to reach certain and sure ground." *Pedigo v. Roseberry,* 340 Mo. 724, 102 S.W.2d 600, 607 (1937).

An exception has been recognized to this general requirement, however, for cases where the skill or technique at issue is one within the knowledge of laymen, *Miller v. Scholl,* 594 S.W.2d 324, 328 (Mo.App.1980), as where a surgeon has left a foreign object in an operative cavity. *Hart v. Steele, supra,* at 932.

Plaintiff argues that here, where a tip of a needle was left within his body in surgery, this exception applies and even absent expert medical testimony, a prima facie case of negligence was made. An analysis of the "foreign object" cases indicates otherwise.

Plaintiff's position finds some comfort in such cases as *Crump v. Piper,* 425 S.W.2d 924 (Mo.1968), in which a sponge was left in the plaintiff's back following surgery. The court found such an occurrence to be one a lay juror can determine would not happen in the exercise of ordinary care and skill. Similarly, in *Null v. Stewart,* 78 S.W.2d 75 (Mo.1934), the surgeon's failure to remove a gauze sponge from the patient's abdominal cavity was held to be prima facie negligent. We do not question the wisdom of these decisions. Common experience tells us that sponges do not get left behind unless someone carelessly fails to account for them. They are the type of item which while deliberately put into surgical cavities, remain behind only if negligently permitted to do so.

A surgical needle tip is entirely different. Although a sponge can be left behind only by negligence, the needle tip here broke and fell into the body not because of any alleged error by Dr. Benoit, but for reasons unknown. As said in *Williams v. Chamberlain,* 316 S.W.2d 505 (Mo.1958),

> The breaking of a hypodermic needle in the course of medical or dental treatment is by no means a thing which, in itself, bespeaks negligence. Needles may break from various causes, as from an unobservable and unknown defect in the needle ... as well as from an improper usage or method. And such a break may occur in spite of all the care and skill which a physician or dentist may employ.... The mere fact that the needle was broken establishes no negligence.

Although *Williams* involved the breaking of a hypodermic needle during an injection rather than a surgical needle, we find the court's logic just as applicable here.[1] Doc-

---

1. *See also Mitchell v. Poole,* 229 Mo.App. 1, 68 S.W.2d 833 (1934), approving an instruction that negligence was not to be presumed from the mere fact that a hypodermic needle broke

tors are not insurers that all equipment used in surgery will operate flawlessly. Needles break and fault can not automatically attach when they do.

We agree with the court in *Williams* that in such a case the real question is whether the defendant was justified as a matter of medical judgment in not removing the fragment. In *Williams,* the doctor balanced the need to remove the fragment with the danger of operating on a patient seriously ill with tetanus and decided to wait. The court held that negligence in that decision could be shown only by expert testimony.

The same is true here. Dr. Benoit balanced the need to remove the fragment with the danger of infection and the greater damage to the chest wall, and decided to close the chest. Precisely because we must acknowledge that we cannot judge the wisdom of that decision, we find this situation distinguishable from the sponge cases. Common knowledge does not extend to such judgmental medical matters.

The range that must be given a physician in the exercise of his judgment was described as "wide" in *Haase v. Garfinkel,* 418 S.W.2d 108, 114 (Mo.1967). Quoting *Snyder v. St. Louis Southwestern Ry. Co.,* 228 Mo. App. 626, 72 S.W.2d 504, 512 (1934), that court stated that a doctor cannot be found negligent in the exercise of his judgment

> unless it be shown that the course pursued was clearly against the course recognized as correct by the profession generally. As long as there is room for an honest difference of opinion among competent physicians, a physician who uses his own best judgment cannot be convicted of negligence, even though it may afterward develop that he was mistaken.

We hold, therefore, that the mere breaking off of the needle was not prima facie negligence. To establish that the decision not to reopen the chest to search for the fragment constituted negligence the plaintiff had to present expert medical testimony that the doctor acted inconsistently with the course recognized as correct by the medical profession.

■ Plaintiff next argues that, even if we decide that expert medical testimony was required in this case, such testimony was offered by plaintiff's witness Gail Ann Scott and erroneously excluded by the trial court. Plaintiff asserts that because Ms. Scott is a registered nurse her testimony was admissible as that of a medical expert.

Although licensed medical doctors are generally called upon to testify as medical experts, *on certain limited medical subjects* other persons have been permitted to testify. For example, in *Harder v. Thrift Constr. Co.,* 53 S.W.2d 34 (Mo.App.1932), a chiropractor was found competent to testify to those medical matters which Missouri statutes require a chiropractor to know. *See also Meyers v. Wells,* 273 S.W. 110 (Mo.1925).

Similarly, in *Harris v. Bales,* 459 S.W.2d 742 (Mo.App.1970), a doctor of osteopathy who testified that he resided and practiced in the same area and was familiar with the standard of care which is ordinarily exercised by the medical doctors in that community, was found competent to express an opinion that the defendant had failed to meet that standard. *See also Cazzell v. Schofield,* 8 S.W.2d 580 (Mo.1928).

We have no doubt that medical personnel at all levels (technicians, paramedics, interns, nurses, as well as chiropractors, doctors of osteopathy and medical doctors) may be qualified to testify to matters *within the limited and precise range of their medical specialties.* The test, after all, is whether the witness "has acquired, by technical training and practical experience ... special knowledge not shared by men in general." *Meyers v. Wells, supra,* at 115.[2] But

---

off in the patient's gums during a tooth extraction. Testimony had been adduced that needles may break in spite of all the care and skill dentists may possess.

**2.** Precedent exists for the proposition that even an embalmer may testify to *limited* medical matters. In *Ryan v. Sheffield Car & Equipment Co.,* 24 S.W.2d 166 (Mo.App.1930), the court held that testimony by the witness that no interference was encountered during a postmortem when instruments were inserted into an artery was admissible. Although the ease

when non-doctors are offered to testify not to the specific tasks which they personally perform but to the standard of care which a physician must meet in a particular situation, the offeror of that testimony must show the rather unusual circumstances which make the witness competent to know the standard of a profession of which he or she is not a member. The burden is not a light one. As a practical matter, very few non-doctors are likely to have the intimate acquaintance with standards of care recognized by practicing physicians which expert testimony on the subject requires.

Even if we assume here that Ms. Scott's credentials establish her as a medical professional competent to testify in certain areas relating to her scrub nurse and circulating nurse experience,[3] the question remains whether she was competent to testify as to the medical standard for doctors for removal of needle fragments from chest cavities. We think not.

In response to the question, "Is there any accepted medical practice in the medical profession to remove a foreign body from the chest cavity?" Ms. Scott answered, "Yes." Her response was not buttressed, however, by any showing either as to *how* she knew what the standard was or in fact, exactly *what* it was. Rather than enunciate the standard, she responded, "I can't imagine a case where you would permit a needle to stay in once you know its there." Be that as it may, this statement informs us what Ms. Scott "imagines" the standard may be but does not tell us what the standard is or how the knowledge of the standard falls within her field of experience. She did add that needles, like sponges, are the type of items nurses carefully count before and after surgery but this tells us nothing about the procedures, considerations, and practices commonly observed when needle fragments are missing.

Ms. Scott's testimony suffers from the same shortcomings as those of the witness in *Swope v. Printz*, 468 S.W.2d 34 (Mo.1971). The court there found that Dr. Jobson was competent to testify as an expert in thyroid medicine notwithstanding the fact that his practice had for many years been limited to psychiatry. Nevertheless, his testimony was held insufficient to make a submissible case because the question posed by counsel asked only for his opinion whether the defendant's performance was consistent with acceptable medical standards *as he knew them*. His "personal, individual understanding of acceptable medical standards" was not shown, nor was his acquaintance with "the standards of learning, skill and proficiency commonly exercised by ordinarily careful, skillful and prudent surgeons in good standing performing [the operation at issue] . . . ." Absent such a showing, the court held at 40 that Dr. Jobson's opinion was based only on his "own disclosed subjective conception of acceptable medical standards and not upon the well-known and required Missouri standard." Ms. Scott's opinion was similarly defective.

We hold that, because Nurse Scott's testimony does not indicate that she was competent to testify to the standard of care ordinarily exercised by doctors for removal of needle fragments from chest cavities, the trial court did not err in excluding her testimony. That being so, plaintiff's case was lacking in the expert testimony necessary to establish that Dr. Benoit failed to meet the requisite medical standard of care and a submissible case was not made.

For the foregoing reasons, we affirm the trial court's ruling directing a verdict in favor of the defendant at the close of plaintiff's evidence.

All concur.

---

of insertion was said to suggest an absence of arteriosclerosis, the testimony was deemed admissible as "not an effort to give expert medical testimony."

**3.** We note that although her experience was limited, experience and competence in a particular field go to the weight, not the admissibility of such testimony. *Swope v. Printz*, 468 S.W.2d 34, 40 (Mo.1971).