**In the Matter of the Care and Treatment of Timothy G. SMITH, Appellant,**

v.

**STATE of Missouri, Respondent.**

No. 25888.

Missouri Court of Appeals, Southern District, Division One.

Nov. 15, 2004.

Emmett D. Queener, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. General, Cheryl Caponegro Nield, Asst. Atty. General, Jefferson City, for respondent.

NANCY STEFFEN RAHMEYER, Judge.

Timothy G. Smith ("Appellant") appeals from the probate division of the Polk County circuit court's judgment finding him to be a sexually violent predator ("SVP") pursuant to section 632.480(5)(a)[1] and committing him to the custody of the director of the Department of Mental Health ("DMH") for control, care, and treatment pursuant to section 632.495. Appellant argues two points on appeal. First, he contends there was insufficient evidence presented by the State for the jury to find beyond a reasonable doubt that he was more likely than not to engage in predatory acts of sexual violence if not confined to a secure facility. Second, Appellant complains of an instructional error.

## Facts and Procedural History

In 1994, Appellant was charged in Kansas with aggravated indecent liberties with a child when he engaged in sexual activity with a thirteen-year-old girl. Appellant was placed on diversion and required to avoid all contact with girls under the age of 16. Within eight months, however, Appellant was charged with molesting another young female victim, his cousin, who was eight years old. Kurt Huffman, with the Polk County Division of Family Services, interviewed Appellant regarding the incident. Appellant admitted to Huffman that he was not supposed to be around young girls and that he wanted to get help for his problem. When Bolivar Police Officer, Mike Hall, investigated the incident, Appellant admitted that he always favored young girls over older women and indicated most of the time the girls made the first move sexually.

Appellant was charged with and pled guilty to child molestation in the first degree as a result of the second incident. He was placed on probation and sent to the Fellowship House in Kansas City for a twenty-one day sexual offender program. During the program, Appellant was referred to James Zbinden, a therapist at the Truman Medical Center, by a clinical social worker for counseling. Several factors in Appellant's initial clinical assessment at the Fellowship House led to the referral to Zbinden for counseling. These included Appellant's thoughts of having sexual contact with underage girls, his lack of family support, a history of incest, as well as concerns about Appellant's limited intellectual functioning and ability to survive in the community.

During Zbinden's clinical assessment of Appellant, Appellant acknowledged his thoughts of having sexual contact with underage girls. Appellant admitted to Zbinden that he had touched underage girls inappropriately in the past. Again, Appellant indicated to Zbinden that the little girls were coming on to him and enticing him sexually. For instance, Appellant thought that when a young girl was licking her finger that meant she wanted to have oral sex with him, and when she was lick-

1. All references to statutes are to RSMo 2000, unless otherwise indicated.

ing between her fingers, it was a sign that she wanted him to have oral sex with her.

After being released from Fellowship House in Kansas City, Appellant moved to Victory Mission in Springfield. Appellant's probation officer, however, found him living with a woman who had two daughters, one seventeen years of age and the other only eight months old. Appellant was advised by his probation officer to move out. Appellant did move, to Texas, violating his parole. Appellant was found in Texas living with another woman who had two young girls, ages eleven and thirteen. There was no reported incident of molestation in either living situation. Appellant, however, was sent to prison for violating parole.

Jane Walton, a licensed professional counselor, was assigned to work with Appellant as part of the Missouri Sex Offender Program (MOSOP) at Farmington Correctional Center. Part of the program is designed to help sexual offenders identify their triggers and high risk situations. The program also assists the participant in putting together relapse prevention plans. Appellant completed Phase I of the two-phase program.

During an assessment between the two phases, Appellant communicated to Walton that he did not need sex offender therapy because he did not have a sexual problem and would not re-offend in the future. Walton's progress reports during the time he was in the second phase showed Appellant scored "poor" in most categories, was defensive in group, and did not recognize his problems but blamed others for them. Appellant did increase to a score of "fair", but was terminated from the group when he broke confidentiality. Confidentiality is an important part of the sex offender program because if information from the session is shared with the prison population, "people get physically hurt—can be physi-

cally hurt and mentally hurt." He was offered another opportunity to participate in Phase II and complete the program but refused claiming that he was not a sexual offender and did not want to be treated as one. He believed that he did not have a sexual problem and that there was no possibility that he would re-offend.

Appellant was scheduled for release from prison on July 28, 2000. On July 17, 2000, the State filed a petition to commit Appellant to secure confinement in the DMH as an SVP. Two psychologists and a psychiatrist, after an evaluation of Appellant's records, diagnosed him with pedophilia. Appellant's preoccupation with young girls, his desire to be around them, and his misconception that the girls were trying to entice him sexually were all indications which led the psychologists to diagnose Appellant with pedophilia.

After a review of Appellant's records, however, two psychologists and one psychiatrist were unable to agree that Appellant would more likely than not re-offend. Each of the doctors used the same actuarial risk assessment instrument, the Static–99, to determine the likelihood of Appellant re-offending. This assessment cites the primary risk factors, based upon research, that help predict whether someone will re-offend or not. Static–99 specifically offers ten established risk factors, each weighted statistically, which are associated with sexual reconviction. Appellant scored a 2 on the Static–99 instrument, which translated into the medium to low range risk of sexual re-offense. This converts into a nine percent probability of sexual-reconviction in 5 years. One of the psychologists, Dr. Phenix, and the psychiatrist, Dr. Lacoursiere, elevated Appellant's score to a higher range risk of sexual re-offense based upon actuarial risk factors not contained in the Static–99. It is from the elevation of Appellant's score on the

Static–99 that Appellant bases his first point on appeal.

Dr. Phenix testified that the Static–99 has limitations in its ability to predict re-offenders; she believed the instrument underestimates the actual number of likely re-offenses because it only considers those offenders that would be caught and not those that would re-offend. She found this to be an important distinction because most sexual offenses are not reported. The number of sexual offenders who are reconvicted, therefore, is significantly lower than the number who re-offend and the Static–99 significantly underestimates the actual number of re-offenses. Dr. Phenix also testified that Static–99 does not include all of the known risk factors because it only lists the static factors, those factors that are historically based such as how many prior sex offenses they have and whether an offender has unrelated victims. The test does not include any dynamic factors or changeable factors, such as understanding emotional identification with children and learning to develop relationships with adults. She claimed that because Static–99 is not a thorough indicator of predicting re-offenders, it is necessary to consider other factors.

Dr. Phenix testified the most important factor to consider, which is not included in the Static–99 instrument, is whether Appellant had successfully completed a credible sex offender treatment program. She maintained when such treatment is completed, it significantly reduces the risk of sexual re-offense because the treatment program helps offenders identify their individual re-offending cycle and develop plans to prevent re-offending. Dr. Phenix noted that Appellant did not do well in MOSOP, was rated poorly, felt he did not need treatment, and declined to finish his treatment program even though he was given an opportunity to do so.

Dr. Phenix also identified other risk factors which she considered and are not included in the Static–99 instrument. These included the fact that Appellant did not see himself as a risk and this, in turn, affected any possibility of treatment gains and increased his risk of re-offending. Appellant also demonstrated a lack of cooperation with supervision, thus increasing the risk of sexual re-offense since it made it more likely than not that Appellant would place himself in high risk situations in the future. Dr. Phenix testified that her diagnosis of Appellant's pedophilia constituted a mental abnormality because of his inability to control his behavior. She noted he received a diversion in 1994 and yet continued to place himself in situations where he knew young girls would be.

Dr. Lacoursiere, while utilizing the same instrument, Static–99, to determine a score of 2 for Appellant's likelihood of re-offense, also found that Appellant is more likely than not to sexually re-offend. Dr. Lacoursiere, also, testified Appellant was more likely than not to re-offend because of the dynamic factors specified by Dr. Phenix. Additionally, Dr. Lacoursiere used another test known as the MnSOST–R. This test, unlike the Static–99, assesses dynamic factors. Dr. Lacoursiere scored Appellant at a 9, which correlates to a 63% re-arrest rate over six years; he testified that even this instrument underestimates the chance of re-offense because it fails to consider the strongest factor connected with re-offending, which is a diagnosis of an untreated sexual deviance, such as pedophilia.

Dr. Jackson, a psychologist with the DMH and a witness for Appellant, diagnosed Appellant with pedophilia but testified that this did not rise to the level of being a mental abnormality by which Appellant could not control his behavior. Mental abnormality is described in the

statute as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." Section 632.480(2). Jackson based his opinion upon this statutory definition of mental abnormality, which primarily means an individual must have serious difficulty controlling his behavior. He noted that Appellant's records lacked any evidence of a serious difficulty in controlling behavior. Again, Dr. Jackson gave Appellant a score of 2 on the Static–99 test and acknowledged the fact that the Static–99 does not contain all the risk factors that must be examined to produce a thorough evaluation, but Dr. Jackson also indicated that Dr. Hanson, the developer of the Static–99, warns evaluators from straying too far from the actuarial score and advises them to stay within a narrow range. Dr. Jackson opined that Appellant does not have more than a 50% risk of re-offending.

Dr. Jackson found no mental abnormality despite the diagnosis of pedophilia. While Dr. Jackson does admit that there were a couple of incidents with young girls over a short time span, he notes that Appellant has controlled his behavior and has not sexually offended since then. Dr. Jackson opined Appellant did not meet the required statutory definition of an SVP and should, therefore, not be committed to the DMH.

On July 11, 2003, after the jury found Appellant to be an SVP, the probate division entered a judgment and commitment order directing that Appellant be placed in the custody of the DMH "for care, control, and treatment until such time as [Appellant's] mental abnormality has so changed that he is safe to be at large" pursuant to Missouri's Sexual Predator Act ("SVP

Act") section 632.480 *et seq.* Appellant timely filed this appeal.

### I. Sufficiency of Evidence for Jury Verdict

In his first point on appeal, Appellant contends there was insufficient evidence to prove beyond a reasonable doubt that he was more likely than not to engage in predatory acts of sexual violence. Specifically, Appellant contends the jury verdict elevated speculation regarding appellant's potential for future behavior over demonstrated proof that he could control his behavior in the community. Appellant bases this contention on the testimony of Dr. Jackson and the validity of elevating the Static–99 tests.

The evidentiary standard for commitment of an SVP is the same standard used in criminal cases. *Whitnell v. State,* 129 S.W.3d 409, 415 (Mo.App. E.D. 2004). We must determine, therefore, whether the evidence is sufficient for twelve reasonable jurors to believe beyond a reasonable doubt that Appellant is an SVP. *Id.* The evidence is viewed in the light most favorable to the jury verdict and we disregard all contrary evidence and inferences. *Amonette v. State,* 98 S.W.3d 593, 600 (Mo.App. E.D.2003). In order to reverse a jury's verdict for an assertion of insufficiency of the evidence, we must find a complete absence of probative fact supporting the jury's conclusion. *Brooks v. SSM Health Care,* 73 S.W.3d 686, 692 (Mo.App. S.D.2002). To commit an SVP, therefore, the State must prove: Appellant has a "congenital or acquired condition affecting [his] emotional or volitional capacity that predisposes [him] to commit sexually violent offenses in a degree that causes [him] serious difficulty in controlling his behavior." *Thomas v. State,* 74 S.W.3d 789, 792 (Mo. banc 2002). Also, the state must show that he is more likely

than not to engage in predatory acts of sexual violence if not confined. *Id.* at 791.

■ Appellant cites to his expert to support his contention that he was not more likely than not to engage in predatory acts of sexual violence if not confined, however, the state presented two experts to contradict Appellant's position. Dr. Phenix and Dr. Lacoursiere diagnosed Appellant with pedophilia and testified this diagnosis constituted a mental abnormality by which defendant could not control his behavior. They pointed to other factors which needed to be taken into consideration to determine whether Appellant was more likely than not to re-offend. Although Dr. Jackson, Appellant's expert, diagnosed Appellant with pedophilia and claimed it did not rise to the level of a mental abnormality, we cannot choose his testimony as more credible than Dr. Phenix or Dr. Lacoursiere's testimony. Dr. Jackson further testified that Appellant was rated low on the Static–99 instrument and that outside factors should be construed narrowly and in keeping with the initial score on the Static–99. We are not permitted to second-guess whom the jury chooses to believe, as this court leaves both the issue of credibility and the weight to be afforded conflicting evidence to the jury. *Davolt v. Highland,* 119 S.W.3d 118, 127 (Mo.App. W.D.2003).

Substantial evidence supports Dr. Phenix's and Dr. Lacoursiere's diagnosis as to Appellant's likelihood of re-offending. The evidence included Appellant's lack of treatment and his blaming the victims for coming on to him. He never acknowledged the emotions of his victims. Furthermore, Appellant put himself in a position to be around young girls on more than one occasion despite explicit warnings not to be around young children. Appellant refused treatment, has no relapse prevention plan, and showed lack of remorse and an inability to acknowledge his problem. He simply stated he has no problem and did not need treatment. Appellant claims his ability to be around young girls without charges being filed proves that he will not re-offend. We defer to the testimony provided at the trial. The evidence is sufficient for twelve jurors to find, beyond a reasonable doubt, that Appellant was more likely than not to re-offend; Point I is denied.

## II. Jury Instruction

■ In his second point on appeal, Appellant contends that the court erred in giving an instruction instructing the jurors, "If you find Respondent to be a sexually violent predator, the Respondent shall be committed to the custody of the director of the department of mental health for control, care and treatment," because it diminished the sense of jurors' responsibility in not being told that the commitment was for indefinite treatment.[2]

We find this identical issue has been previously addressed by this court. *Care and Treatment of Scates v. State,* 134 S.W.3d 738 (Mo.App. S.D.2004), *Care and Treatment of Goddard v. State,* 144 S.W.3d 848 (Mo.App. S.D.2004). In *Scates,* we held that the jury instruction given was proper because the Sexually Violent Predator Act ("SVP Act"), section 632.492, specifically prescribes the instruction which must be given to the jury. That

**2.** Initially we note Appellant, in his argument, complains of the denial of his request to argue that any treatment would be of an indeterminate length. Appellant's "Argument" regarding his complaint does not conform to the requirements of Rule 84.04(e). "The argument shall be limited to those errors included in the 'Points Relied On.'" Rule 84.04(e), *Martin v. Morgan,* 61 S.W.3d 300, 302 (Mo.App. E.D.2001). A complaint regarding a limitation on his closing argument is not included in his 'Points Relied On', thus, we shall disregard that argument.

section provides: "If the trial is held before a jury, the judge shall instruct the jury that if it finds that the person is a sexually violent predator, the person shall be committed to the custody of the director of the department of mental health for control, care and treatment." Since there was not an MAI instruction applicable to this case[3], the trial court acted correctly in mirroring the language from the SVP Act and "follow[ing] the substantive law." *Care and Treatment of Lewis v. State*, No. 62339, slip op. at 6, — S.W.3d —, —, 2004 WL 2216496 (Mo.App. W.D. filed Oct. 5, 2004). Additionally, we note that the trial court complied with the SVP Act's mandate that "the judge *shall* instruct the jury" that once adjudicated as an SVP, a defendant is subject to civil commitment. Section 632.492. (emphasis added). Point II is denied. The judgment is affirmed.

GARRISON, P.J., and PREWITT, J., concur.

---

3. If there is no applicable Missouri Approved Instruction ("MAI"), Rule 70.02(b) requires that "such instructions shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." *Scates* at 742.