**Harry McLAUGHLIN and Doris McLaughlin, Appellants,**

v.

**Raymond GRIFFITH and Freeman Health System, Respondents.**

No. 27679.

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 5, 2007.

Petition for Rehearing or Reconsideration
Denied Feb. 27, 2007.

Richard D. Crites, Springfield, for appellants.

Kent O. Hyde, Springfield, for respondent.

DANIEL E. SCOTT, Judge.

Plaintiffs appeal from a directed verdict in Defendants' favor in their medical negligence action.

■ We review the facts most favorably to Plaintiffs in determining if they made a submissible case. *Boehm v. Pernoud,* 24 S.W.3d 759, 761 (Mo.App.2000). Plaintiff Harry McLaughlin, then age 64, fell on his back from a two-foot stepladder. He remained in moderate discomfort several hours later, so his wife drove him to the Freeman Hospital emergency room for an X-ray. Defendant Dr. Griffith physically examined Mr. McLaughlin, diagnosed a dislocated left shoulder, and ordered and reviewed X-rays. Dr. Griffith sedated Mr. McLaughlin and performed a traction/counter-traction reduction to manipulate the shoulder back to the correct anatomical position. The procedure was painful, and afterward, Mr. McLaughlin's shoulder and arm hurt far worse than before. Pain and swelling persisted for seven months or longer, during which time Mr. McLaughlin had to sleep in a recliner, with his arm in a wooden trough for relief. The McLaughlins sued Dr. Griffith, and his employer Freeman on a respondeat superior theory, claiming the reduction was unnecessary and negligently performed because Mr. McLaughlin's shoulder was never dislocated.

At trial, Defendants moved for a directed verdict at the end of Plaintiffs' case, claiming Plaintiffs' retained expert never properly defined the standard of care. The trial court recalled the evidence similarly, and Plaintiffs never disagreed, arguing only that expert testimony was unnecessary. After further argument and a recess to read cases cited by the parties, the court granted the motion.

■ To make a submissible case, Plaintiffs had to show Dr. Griffith's actions (1) violated the applicable standard of care; (2) were performed negligently; and (3) injured Mr. McLaughlin. *Boehm,* 24 S.W.3d at 761. Medical negligence is "the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of the defendant's profession." MAI 11.06; *Ladish v. Gordon,* 879 S.W.2d 623, 628 (Mo. App.1994). This standard of care generally must be established by expert testimony. *Id.* An adverse result raises no presumption of negligence. *Id.* A physician's honest but mistaken diagnosis creates no liability unless the MAI 11.06 standard of

care was violated. *Boehm*, 24 S.W.3d at 761.

Plaintiffs' retained expert, Dr. Bartal, testified by video deposition. His standard of care testimony follows:

Q (by Plaintiffs' counsel): Are you familiar with the standard of care required of an emergency physician in the four state area of eastern Kansas, southeastern Kansas, southwestern Missouri, northeastern Oklahoma, and northwest Arkansas?

A: No.

Q: Are you familiar with the standard of care for emergency physicians who have just finished residency?

A: No.

Q: Does the standard of care for an emergency physician require the physician to look at the x-rays before they attempt to reduce what they think may be a dislocated shoulder?

A: I would assume so, yes.

Q: Would you assume so or would it?

A: It should be.

Q: And is that the standard of care?

A: Yes.

Q: And is that your opinion, to a reasonable degree of medical certainty?

A: Yes.

Q: Now, the reason for that standard of care, does it go back to physician do no harm?

A: Yes.

Q: If you have an x-ray that is reportedly normal, that we've seen earlier in your testimony here today, and from the radiological reports of Dr. Paul S. Jones that are on pages 6 and 7 of Exhibit 1, both of which show, no fractures or dislocations are identified, soft tissues appear normal, the glenoid humeral joint and acromial humeral joint space are well preserved, no fracture or disloca-

tion is identified in the shoulder, would it be beneath the standard of care of an emergency physician, in light of those x-rays, to attempt to reduce a dislocated shoulder?

A: Yes.

Q: And is that your opinion to a reasonable degree of medical certainty?

A: Yes.

. . . .

Q (by Plaintiffs' counsel): So if you are not dealing with a dislocated shoulder, is it your opinion, to a reasonable degree of medical certainty, that the standard of care on an emergency physician requires that maneuver not to be done?

A: Yes.

An expert who testifies solely in terms of "standards of care," without reference to MAI 11.06 or comparable language, does not satisfactorily articulate the appropriate legal standard. *Ladish*, 879 S.W.2d at 634. Every medical negligence expert should be properly oriented with the established legal standard. Although the standard need not be recited in ritualistic fashion, the expert's testimony in context should prove that the proper legal standard was used. *Id.* It is not enough that MAI 11.06 instructs the jury what negligence means; jurors must know an expert's opinion is based on MAI 11.06 and not something else. *Id.*

If attorneys and expert witnesses are allowed to become sloppy in the use of terms such as "accepted standards" and "standards of care" without specifying at some point in the witness' testimony the meaning of those terms, experts will inevitably tend to rely upon their own views of acceptable practice rather than applying the objective legal standard. *Id.* at 634–35.

■ Dr. Bartal never established the "standard of care" in MAI 11.06 terms or

anything close.[1] Nearest to any definition was his statement that the standard of care's rationale "go[es] back to physician do no harm." Suggesting a standard of care solely in "do no harm" terms is not merely incorrect, but seriously misleading, and fails the well-established test of *Ladish* and other cases.

Plaintiffs' main Point I argument claims the trial court improperly discounted Dr. Bartal's testimony by applying the long-discarded "locality rule."[2] Although Dr. Bartal never defined the standard of care he was using, as previously noted, he specifically denied knowing the standard of care for emergency physicians in this geographic area or freshly out of residency:

Q (by Plaintiffs' counsel): Are you familiar with the standard of care required of an emergency physician in the four state area of eastern Kansas, southeastern Kansas, southwestern Missouri, northeastern Oklahoma, and northwest Arkansas?

A: No.

Q: Are you familiar with the standard of care for emergency physicians who have just finished residency?

A: No.

The trial court later recalled Dr. Bartal's disclaimers in the context of an *overall* failure to define the standard of care:

THE COURT: Okay. Let's go back to the first question, the standard of care issue.

PLAINTIFFS' COUNSEL: Yes, sir. Standard of care—.

THE COURT: There's no doubt the man said he was not familiar with what the standard of care was for an Emergency Room physician in southwest Missouri, that he was not familiar with what the standard of care was for Emergency Room physicians who have just finished residency. *I don't recall, and maybe I'm wrong, anywhere in the videotape that was played to the jury where he ever once indicated that the—what the standard of care was that he was talking about. Maybe I'm wrong. How do we get around that?*

PLAINTIFFS' COUNSEL: Well, very simply. You don't need expert testimony in this particular case . . . . (emphasis added)

Thereafter, Plaintiffs argued only that expert testimony was unnecessary, but never suggested the court's recollection was wrong. Nor did Plaintiffs make a "locality" argument then, and the record belies their claim now.[3] The trial court correctly ruled that expert testimony never established the MAI 11.06 standard of care or that Dr. Griffith violated it.

■ Plaintiffs' fallback argument is that they needed no expert testimony in this case, under the exception for cases where the skill or technique at issue is within general lay knowledge, as where a surgeon leaves a sponge in the body. *See Cebula v. Benoit*, 652 S.W.2d 304, 307 (Mo.App. 1983). This applies only " 'where the want of skill or lack of care is so apparent as to

---

**1.** Plaintiffs also offered testimony from Dr. Griffith and two other Freeman physicians, none of whom defined the standard of care in MAI 11.06 or comparable terms either.

**2.** *Gridley v. Johnson*, 476 S.W.2d 475, 481–82 (Mo.1972) did away with the locality rule in medical malpractice cases. In 1978, MAI 11.06 was revised accordingly to its current form.

**3.** We word-searched the motion argument in vain for "local," "locality," "regional" or any similar utterance by the court or any attorney. Moreover, Plaintiffs can hardly complain about geographical references injected into the case solely by and through their own questions.

be within the comprehension of laymen and requires only common knowledge and experience to understand and judge it.'" *Hart v. Steele*, 416 S.W.2d 927, 932 (Mo. 1967), quoting *Modrzynski v. Lust*, 88 N.E.2d 76, 77 (Ohio App.1949). This exception is tightly circumscribed, lest lay jurors establish arbitrary standards on matters beyond their common experience and knowledge, and decide crucial issues on speculation, conjecture, and surmise. *Hurlock v. Park Lane Medical Center*, 709 S.W.2d 872, 883 (Mo.App.1985).

*Cebula* and the surgical sponge cases illustrate the exception's limited scope, and why it does not apply here. Common experience tells us sponges are left in surgical cavities only if someone carelessly fails to account for them. *Cebula*, 652 S.W.2d at 307. But this reasoning does not extend to the broken surgical needle in *Cebula*, nor other foreign objects that can be left behind without negligence. *Id.* at 307–08. The real question in *Cebula* was whether the doctor's decision not to recover the needle tip was justified as a matter of medical judgment. Common knowledge does not extend to such medical judgments; expert testimony is required to establish negligence in such decisions. *Id.* at 308. A physician is allowed "wide" range in exercising medical judgment, and cannot be found negligent in such judgment absent proof the course pursued was clearly against the course recognized as correct by the profession generally. If an honest difference of opinion can exist among competent physicians, a physician who uses his best judgment cannot be convicted of negligence, even if it later develops that he was mistaken. *Id.*

Similarly, the real questions here are whether Dr. Griffith's reduction was an appropriate medical judgment based on his examination and X-ray review, and whether it was performed properly. As in *Cebu-*

*la*, and in contrast to forgotten surgical sponges, common lay knowledge does not extend to these medical matters.

Plaintiffs rely primarily on *Seippel–Cress v. Lackamp*, 23 S.W.3d 660 (Mo.App. 2000), where an elderly lady's condition unexpectedly changed for the worse after an outpatient barium swallow test. Her doctor and the hospital sent her home anyway. She died the next day. The court agreed "the great majority of malpractice cases" require expert testimony (*Id.* at 667), and the exception is limited to "unusual circumstances" (*Id.* at 668), but concluded under those facts that:

> Lay persons know that when there is an *unexpected* and *unusual* change in the condition of a patient which gives evidence that the patient is having significant difficulty, the medical provider cannot send that person home, as though everything were normal, without attempting to determine what is wrong with that patient.

*Id.* at 669.

Unlike *Seippel–Cress*, Plaintiffs do not contend Dr. Griffith ignored Mr. McLaughlin's changed condition, sent him home, and effectively abandoned him. Instead they claim Dr. Griffith misdiagnosed and mistreated Mr. McLaughlin's shoulder; medical matters not within common lay knowledge and therefore distinguishable from *Seippel–Cress*. We might hypothesize a medical negligence claim that requires no expert medical testimony, but it would not be this case. Plaintiffs' witnesses, the McLaughlins aside, were four physicians and a registered nurse, and the weight of Plaintiffs' evidence was medical testimony about Dr. Griffith's diagnosis and treatment. Plaintiffs' evidence, and how they presented their case, shows they did not deem this the "unusual circumstance" where expert testimony was unnecessary. Plaintiffs treated this as one of

"the great majority of malpractice cases" where expert testimony must establish the standard of care and negligence, and they repeatedly offered expert testimony about Dr. Griffith's diagnosis, care, and treatment. Unfortunately for Plaintiffs, their evidence simply did not make a submissible case. Judgment affirmed.

RAHMEYER, P.J., and PARRISH, J., concur.