**In the Matter of the Care and Treatment of James UNDERWOOD, Appellant,**

v.

**STATE of Missouri, Respondent.**

**WD 79194**

Missouri Court of Appeals, Western District.

Opinion filed: May 2, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied May 25, 2017

862

Chelsea R. Mitchell, for Appellant

Karen L. Kramer, for Respondent

Before Division One: Gary D. Witt, Presiding Judge, Alok Ahuja, Judge and Edward R. Ardini, Jr., Judge

### EDWARD R. ARDINI, JR., JUDGE

James Underwood (Underwood) appeals his civil commitment for control, care, and treatment as a sexually violent predator. Underwood raises eight points on appeal. The first three points challenge the constitutionality of various aspects of the Sexually Violent Predator Act (Act). Underwood's fourth point argues that the trial court erred in permitting use of the term "sexually violent predator" during trial. His fifth point argues that the trial court plainly erred in admitting diagnoses from six non-testifying doctors. Underwood's sixth point contends that the trial court's finding that Underwood suffered from a "mental abnormality" was not supported by substantial evidence. Underwood argues in his seventh point that the trial court erroneously declared and applied the law regarding the phrase "more likely than not." His final point claims that the trial court erred because the judgment that Underwood was more likely than not to commit "predatory" acts was not supported by substantial evidence. Finding no error, we affirm.

## BACKGROUND [1]

In 2007, Underwood was found not guilty by reason of mental disease or defect (NGRI) on eight charges: six counts of statutory sodomy in the first degree, two counts of attempted statutory sodomy in the first degree, and one count of assault in the second degree. He was committed to the Department of Mental Health (DMH). In 2013, the State of Missouri filed a petition in the Circuit Court of Jackson County seeking to civilly commit Underwood as a sexually violent predator. A bench trial was conducted in 2015. The trial court found Underwood to be a sexually violent predator and ordered that he be committed to the custody of DMH. Underwood appeals.

### Dr. Jeffrey Kline

The evidence at trial established that Underwood's underlying sexual offenses occurred over a period of four years. His first charge for sexual assault occurred in Illinois in 2001 for acts committed against his eight-year-old stepson. Underwood discussed the incident with Dr. Jeffrey Kline, a certified forensic examiner with DMH and a psychologist at Fulton State Hospital, who had performed sexually violent predator evaluations since 2003. Underwood indicated to Dr. Kline that he "accidentally touched" his stepson's penis and reported himself to the child abuse hotline. Underwood stated that he thought he was "sick" at the time. Underwood also reported four additional sexual encounters with his stepson that had previously occurred and involved forcing his stepson to perform oral sex on him and performing oral sex on his stepson. As a result of the incident that Underwood self-reported, he was placed on probation in the state of Illinois. Underwood also revealed that he had engaged in sexual relations with his six-year-old stepdaughter and six-year-old

---

1. In a court-tried case, "we view the evidence and any inferences therefrom in the light most favorable to the judgment." *Scholz v. Schenk*, 489 S.W.3d 306, 309 (Mo. App. W.D. 2016) (citation and internal quotation marks omitted).

niece, including digital penetration, oral sex, and vaginal sex, prior to his 2001 arrest. He found the encounters to be sexually arousing and indicated that he acted on his sexual urges more frequently when he was intoxicated. Underwood told Dr. Kline that he felt he "was always one step ahead of the law."

Within three months of being placed on probation, Underwood relocated to Missouri, despite the fact that Missouri did not accept transfer of his probation. Underwood engaged in sexual behaviors with two nieces and a nephew between 2001 and 2004, leading to his arrest in Missouri in 2005. The nephew disclosed that Underwood had touched, licked, and rubbed his penis "lots of times." He also disclosed that Underwood penetrated him with his penis on at least one occasion and performed oral sex on him multiple times. He was eight- to nine-years-old during this time. One of Underwood's nieces reported that Underwood performed oral sex on her and also touched her both vaginally and anally. She was four- to five-years-old at the time. Underwood told Dr. Kline that he felt aroused by the activities with his niece and nephew. Underwood indicated that he consumed large quantities of methamphetamine, marijuana, cocaine, and phencyclidine (PCP) during these timeframes, which made his urges more difficult to control. Underwood denied engaging in any sexual behavior with his other niece, but she reported that he touched her breasts or genital area on top of her clothing.

Underwood reported to Dr. Kline that he first became sexually active at twelve-years-old. Underwood hosted parties at his home, inviting other children around his age and providing them with alcohol and marijuana in hopes of disinhibiting his guests so that they would engage in sexual behavior. Underwood would sexually engage with multiple male and female individuals. Although Underwood was investigated as a juvenile several times, formal charges were never filed.

Throughout Underwood's treatment at Fulton State Hospital while in the custody of DMH, he engaged in inappropriate sexual encounters with his peers. Underwood was once found masturbating and kissing with a male peer in his room. Underwood later told Dr. Kline that he had felt threatened by the other man and that the act was not voluntary. Other sexual encounters, however, were consensual. These encounters were against the facility rules and demonstrated to Dr. Kline that Underwood was not able to control his behavior even when he was being sanctioned for it. The sanctions included being placed in "one-to-one," which meant that a staff member was always sitting within arm's reach of Underwood when he was awake to ensure that he did not engage in further sexual encounters. On another occasion, Underwood masturbated in front of a female staff member while he tried to engage her in conversation. Dr. Kline was also concerned that Underwood engaged in these actions when he knew that he was being evaluated for referral to the Sexual Offender Rehabilitation and Treatment Services (SORTS) program.

During an interview with Dr. Kline, Underwood stated that he had "no sexual urges towards prepubescent early adolescent children" but disclosed that he retains "strong urges for sex." These urges involved adult women and sometimes men. He revealed that "he thinks about it all the time" and "masturbates all day long." Underwood acknowledged that he had sexual feelings for children in the past but stated that the feelings had stopped for reasons that he was unable to explain around the time of his arrest.

Dr. Kline diagnosed Underwood with pedophilia, non-exclusive type, per the criteria in the Diagnostic and Statistical Manual of Mental Disorders. The diagnosis was in part based on the incidents with Underwood's stepson, stepdaughter, niece, and two nephews, all prepubescent victims. Dr. Kline found that Underwood had a sexual attraction, fantasies, and urges toward prepubescent children that had occurred for more than six months in time. Dr. Kline also found Underwood's claim that he no longer had sexual feelings toward children suspect, as he never had an individual suffering from pedophilia have the urges totally disappear. Dr. Kline additionally considered that Underwood was on probation for three months or less when he began to engage in sexual behaviors with a new set of victims after relocating to Missouri.

Dr. Kline also diagnosed Underwood with borderline personality disorder, antisocial personality disorder, and polysubstance dependence while in a controlled environment. Dr. Kline additionally found that Underwood had a prior history of malingering because Underwood had lied in the past about suffering from auditory hallucinations and had exaggerated his psychiatric symptoms. Dr. Kline reviewed reports showing Underwood had previously been diagnosed as bipolar but concluded that the records did not support a present or past bipolar diagnosis.

Dr. Kline further found that Underwood was more likely than not to perpetrate future acts of predatory sexual violence, relying on both actuarial assessments and other factors. Dr. Kline used two actuarial tools to assess Underwood's likelihood of perpetrating future acts of sexual violence. Underwood's scores indicated a moderate to high risk of (1) reoffending and (2) reoffending and getting caught. These tools underestimate the risk because they rely upon the person being either arrested and charged or actually convicted; individuals likely commit offenses but are never caught or detected. Dr. Kline also considered other factors that might decrease or increase Underwood's future risk of reoffending. Dr. Kline considered that pedophilia can increase a person's risk to reoffend in the future. Underwood's antisocial personality disorder further contributed to a higher risk of re-offense in the future because research has shown that individuals with antisocial attitudes were more likely to commit future acts of sexual violence. Underwood's serious difficulty controlling his sexual behavior was also a contributing factor. For example, the fact that Underwood engaged in new sexual behavior while on probation from his prior sexual offenses was predictive of him again engaging in sex offending behavior in the future. Underwood also had serious difficulty controlling his behavior in other areas, including anger, aggression, and general emotional regulation.

Dr. Kline found nothing in Underwood's records that would reduce his risk of committing sexual acts in the future. For example, Underwood did not actively participate in sexual offender therapy and would stop going to group therapy for periods of time. There was also nothing in the records demonstrating that he made any substantive change in his understanding of his sexual behavior or his ability to control his behavior. Dr. Kline believed that Underwood had exhausted psychiatric treatment at Fulton State Hospital and would be better served in the SORTS program, which would provide more targeted treatment for his sex offending behaviors while also addressing his emotional dysregulation.

Based on the evidence described above, Dr. Kline's opinion, within a reasonable degree of psychological certainty, was that

Underwood met the criteria of a sexually violent predator.

### Dr. Jeanette Simmons

Dr. Jeanette Simmons, who had been the Forensic Coordinator and Director of Psychology at Northwestern Missouri Psychiatric Rehabilitation Center and had ten years of experience conducting sexually violent predator evaluations, similarly concluded that Underwood suffers from non-exclusive type pedophilia and that he met the statutory definition of a sexually violent predator. Dr. Simmons reviewed Underwood's records and utilized the Diagnostic and Statistical Manual of Mental Disorders in reaching her opinion.

Dr. Simmons' opinion was based on Underwood's sexual offenses against his stepson, stepdaughter, nieces, and nephew, as well as his admissions to various examiners that he had an attraction to prepubescent children. Dr. Simmons observed that, with the exception of Dr. Abbott, multiple doctors had diagnosed him with pedophilia. Underwood's records reflected his attraction to children and that he had acted on that urge and desire. Underwood continued to admit an attraction to both boys and girls following his transfer to the SORTS program. He compared young children trying to look older to police entrapment. Underwood also made several additional admissions in his deposition that Dr. Simmons found to be significant. Underwood admitted that "young kids attract [him]" and that he was attracted to the "looks of young children" because of their innocence. Underwood described how he engaged his nieces and nephews in sexual encounters. Underwood also admitted to liking television shows with "a lot of children," such as Full House. The records also revealed that Underwood had been inconsistent in his reporting of which offenses did or did not occur as well as the extent of the offenses and any harm caused to the victims. At one time, Underwood indicated that his sister may be partially to blame because she was aware that he was on probation for the sexual offense in Illinois and nevertheless left him with her children. Underwood also stated that he had more respect for his brother, found his sister's children to be more attractive, and was disappointed when his request for his siblings to bring their children to visit him at Fulton State Hospital was denied. Underwood additionally admitted to volunteering with a church to work with young children while he was on probation for his sexual offenses committed in Illinois. He indicated that he knew he should not have volunteered but did it anyway because he liked to do it. Underwood has also indicated that it is difficult to go places in the community, such as a grocery store, and entirely avoid children.

Dr. Simmons additionally found that Underwood has demonstrated an inability to control himself sexually. Underwood engaged in sexual activity with other patients on several occasions; although the encounters may have been consensual, they were not permitted within the facility. Dr. Simmons noted that Underwood had masturbated in front of a "one-to-one" staff member, initially rubbing himself under the covers, asking about her children, and then exclaiming something along the lines of "I just can't stand it anymore" and throwing off the covers. Most recently, Underwood had been moved from one unit to another due to physical altercations, including an alleged sexual assault of another peer. Significantly, Underwood's behavior continued even while he was aware that he was being evaluated for possible referral as a sexually violent predator, which Dr. Simmons believed spoke to his lack of impulse control.

Dr. Simmons also found that Underwood was more likely than not to commit acts of sexual violence if not confined to a secure facility. Dr. Simmons performed an assessment to determine the risk of Underwood reoffending. Like Dr. Kline, Dr. Simmons' assessment score placed Underwood in the moderate to high risk category. Dr. Simmons testified that recidivism rates of other individuals with the same score are between eighteen and thirty percent. However, the assessment underestimates the risk of re-offense because it only refers to convictions. Dr. Simmons additionally considered other factors to reach her conclusion, such as Underwood's childhood maladjustment, poor impulse control, sexual preoccupation, and the fact that Underwood's prognosis did not change significantly during his several years of treatment. Underwood's refusal to take his medications was also noted. Dr. Simmons did not see any mitigating factors that might lower his risk of reoffending.

In addition to pedophilia, Dr. Simmons diagnosed Underwood with polysubstance dependence based on his extensive history of abusing many different substances and with borderline personality disorder. Dr. Simmons was aware that Dr. Brian Abbott had diagnosed Underwood with bipolar disorder, but she did not assign him that diagnosis. Dr. Simmons believed the symptoms relevant to a bipolar disorder were better accounted for in borderline personality disorder and also could have been affected by his substance abuse and thyroidism.

Unlike Dr. Abbott, Dr. Simmons did not believe the evidence established that Underwood's sexual behavior occurred during bipolar manic episodes. She testified that Underwood's sexual behavior was a planned action, as he "groomed" the children to cooperate with him by making statements such as, "I have something to show you," and drawing them into conversations about sex in a way that appeared innocent and not threatening, such as through the use of games like playing house or doctor. His numerous victims also demonstrated that Underwood was sexually attracted to prepubescent children rather than having a transient attraction or merely taking advantage of opportunistic events. Dr. Simmons additionally noted that Underwood was punished for the behavior and then went to another state and again acted upon those behaviors.

Underwood acknowledged in his deposition that he suffers from a mental illness, which he referred to as bipolar disorder, and that when his disorder "kicks in," he loses control, things just happen that he does not always remember, and he does not think about consequences. He indicated some episodes had occurred within a few months of the deposition, including some physical altercations, punching walls, and threatening staff. Underwood reported that he thought his bipolar disorder would "kick in" again. Underwood also admitted to being dishonest in his court proceedings, which was also documented in his records. For example, he stated to examiners that he faked symptoms in order to avoid jail but then later contradicted that assertion and admitted to the symptoms occurring.

## Dr. Brian Abbott

Dr. Abbott testified as an expert on behalf of Underwood. Dr. Abbott ruled out pedophilia, antisocial personality disorder, and borderline personality disorder and diagnosed Underwood with bipolar disorder. Dr. Abbott found that Underwood's bipolar disorder did not constitute a mental abnormality. Dr. Abbott also found that Underwood's risk level of reoffending "fell well below 50 percent," and that even if he

had a mental abnormality, he would not be more likely than not to reoffend.

## JURISDICTION

 Underwood raises three claims challenging the constitutionality of the Act. "[A]rticle V, section 3 of the Missouri Constitution vests the Missouri Supreme Court with exclusive appellate jurisdiction in all cases involving the validity of a statute." *Brown v. State*, 519 S.W.3d 848, 853, 2017 WL 1149150, at *2 (Mo. App. W.D. 2017) (citing *McNeal v. McNeal–Sydnor*, 472 S.W.3d 194, 195 (Mo. banc 2015)). In order to invoke the Missouri Supreme Court's exclusive appellate jurisdiction, however, "the constitutional issue must be real and substantial, not merely colorable." *Id.* (citing *McNeal*, 472 S.W.3d at 195)). If the constitutional issue is "merely colorable, our review is proper." *Id.* (citing *Ahern v. P & H, LLC*, 254 S.W.3d 129, 134 (Mo. App. E.D. 2008)).

 "In determining whether a constitutional claim is real and substantial or merely colorable, the reviewing court makes a preliminary inquiry as to whether the claim presents a contested matter of right that involves fair doubt and reasonable room for disagreement." *Id.* (citing *Mo. Hwy. and Transp. Comm'n v. Merritt*, 204 S.W.3d 278, 285 (Mo. App. E.D. 2006)). The claim is merely colorable if it "is so legally or factually insubstantial as to be plainly without merit[.]" *Id.* (citing *Merritt*, 204 S.W.3d at 285).

Here, each of the constitutional challenges Underwood raises have been addressed by either the United States Supreme Court or the Missouri Supreme Court and so do not involve fair doubt or reasonable room for disagreement and thus are merely colorable. Accordingly, we have jurisdiction over this appeal.

## STANDARD OF REVIEW

 The judgment in a court-tried case will be affirmed "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Scholz*, 489 S.W.3d at 309 (citations and internal quotation marks omitted).

Appellate review in [a sexually violent predator] case is limited to a determination of whether there was sufficient evidence admitted from which a reasonable [factfinder] could have found each necessary element by clear and convincing evidence. The appellate court does not reweigh the evidence but determines only whether the judgment was supported by sufficient evidence. Matters of credibility and weight of testimony are for the [factfinder] to determine. For that reason, the evidence is viewed in the light most favorable to the judgment, accepting as true all evidence and reasonable inferences favorable to the judgment and disregarding all contrary evidence and inferences. A judgment will be reversed on insufficiency of the evidence only if there is a complete absence of probative facts supporting the judgment.

Questions of law are reviewed *de novo*. *George v. State*, 515 S.W.3d 791, 795–96, 2017 WL 327486, at *2 (Mo. App. W.D. 2017), *reh'g and/or transfer denied* (Feb. 28, 2017) (citations and internal quotation marks omitted).

## ANALYSIS

 An individual may be committed as a sexually violent predator if he has a history of sexually violent behavior. *Id.* A two-prong test must also be satisfied: "(1) the offender must suffer from a mental abnormality; (2) that makes him more likely than not to engage in predatory acts of sexual violence if not confined in a se-

cure facility." *Id.* at 796, *2 (citing *In re A.B.*, 334 S.W.3d 746, 752 (Mo. App. E.D. 2011)).

### Points I–III

Underwood's first three points on appeal allege that the trial court's denial of his motion to dismiss was error because the Act is unconstitutional in that it violates his rights to due process, equal protection, freedom from *ex post facto* laws, double jeopardy, and freedom from cruel and unusual punishment. All of these claims have been addressed and ruled against Underwood's position by either the United States Supreme Court or the Missouri Supreme Court and most recently by this court in *Brown*, 519 S.W.3d at 852–56, 2017 WL 1149150, at *2–4. Because the issues raised are legal and there are no relevant factual distinctions, we will only summarily revisit these identical claims and the points are denied. *See D.T. v. Catholic Diocese of Kansas City–St. Joseph*, 419 S.W.3d 143, 148 (Mo. App. W.D. 2013) (declining to revisit identical claims recently addressed in another appeal).

In Underwood's first point, he argues that commitment under the Act is a punitive lifetime confinement and second punishment. Underwood further argues that the Act's substantive and procedural protections are inadequate and unjustifiably different from any other civil commitment or punitive proceeding in Missouri. The United States Supreme Court and Missouri Supreme Court have determined that, although sexually violent predator proceedings involve a liberty interest, they are civil and thus nonpunitive. *Brown*, 519 S.W.3d at 853–54, 2017 WL 1149150, at *3 (citing *Kansas v. Hendricks*, 521 U.S. 346, 361, 369, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)); *In re Van Orden*, 271 S.W.3d 579, 585 (Mo. banc 2008)). Similarly, "because the Act is civil in nature, initiation of its

commitment proceedings does not constitute a second prosecution" and thus does not violate the Double Jeopardy Clause. *Brown*, 519 S.W.3d at 854, 2017 WL 1149150, at *3 (citing *Hendricks*, 521 U.S. at 369, 117 S.Ct. 2072). "And, because confinement upon commitment does not constitute punishment, commitment cannot be deemed cruel or unusual punishment." *Id.* Additionally, "the phrase 'ex post facto law' applies exclusively to criminal laws" and thus the civil Act does not constitute an ex post facto law. *Id.* (citing *State v. Honeycutt*, 421 S.W.3d 410, 419 (Mo. banc 2013) (internal quotation marks omitted). Point I is denied.

Underwood argues in his second point that the Act is unconstitutional because it does not have a least restrictive environment requirement. This challenge has been rejected by Missouri courts, most recently in *Brown*:

[T]he [Act] "is narrowly tailored to serve [the] compelling state interest ... [of] protecting the public from crime." "This interest justifies the differential treatment of those persons adjudicated as sexually violent predators ...." "Because the basis for commitment of sexually violent predators is different from general civil commitments, there is no requirement that sexually violent predators be afforded exactly the same rights as persons committed under the general civil standard."

*Id.* (citations omitted). Point II is denied.

Underwood's third point on appeal alleges that the Act is unconstitutional because it does not require proof of serious difficulty controlling behavior. Missouri courts have routinely held, however, that serious difficulty in controlling behavior is an element of "mental abnormality" that, although not included in the statutory definition, must be proven by the State. *See, e.g., Murrell v. State*, 215 S.W.3d 96, 106 (Mo.

banc 2007) (listing serious difficulty controlling behavior as an element of "mental abnormality" under section 632.480 [2] and *Kansas v. Crane*, 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002)). Point III is denied.

### Point IV

■ *Brown* also addressed Underwood's fourth claim on appeal that the trial court erred in permitting the use of the phrase "sexually violent predator" at trial because it is inherently pejorative or prejudicial. 519 S.W.3d at 856–57, 2017 WL 1149150, at *5. Here, the phrase was used in the context of expert testimony as to whether or not Underwood met the sexually violent predator definition and in the State's opening statement and closing argument for the same purpose. Although courts have recognized that the phrase may be inherently pejorative or prejudicial, its use is plainly allowed in this manner when "wholly based on the evidence[,]" as the State is required to prove under the Act that the defendant satisfies the definition of a sexually violent predator. *Id.* (citing *George*, 515 S.W.3d at 802, 2017 WL 327486, at *8). Point IV is denied.

### Point V

■ Underwood's fifth point argues that the trial court plainly erred in admitting the diagnoses of six non-testifying doctors. Underwood specifically alleges that the State did not qualify the non-testifying doctors as experts, that no testifying expert relied upon the diagnoses, and that the trial court was influenced by the diagnoses because it considered and relied upon them in reaching its judgment. Underwood's claim arises from an oral comment made by the trial court that, in addi-

tion to the State's two testifying doctors, six other doctors also diagnosed Underwood with pedophilia. This comment was based on testimony from each of the testifying doctors that, according to Underwood's records, nearly all doctors had diagnosed him with pedophilia.

Underwood did not preserve the point for appeal because he did not object to the lines of questioning or statements at trial nor raise the issue in his post-trial motion, but a plain error affecting a substantial right may be considered at the court's discretion "when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Rule 84.13(c); *Brown*, 519 S.W.3d at 859, 2017 WL 1149150, at *8. Section 490.065 allows expert opinions to be in part based on hearsay when the facts or data are "reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and [are] otherwise reasonably reliable." Here, both of the State's experts testified that they relied on the records of Underwood's treatment by other professionals, which are records reasonably relied upon by experts in their field, in developing their opinion. They further noted that their review revealed that other doctors had diagnosed Underwood with pedophilia. However, they each made clear during their testimony that they had independently reached their own conclusions.

The oral statement of the trial judge at issue was as follows:

THE COURT: ... The testimony was from the State and the respondent's expert that Mr. Underwood suffers from a mental abnormality. The State's experts had certain diagnoses and Mr. Underwood's expert had another. I believe

**2.** Statutory citations are to the Revised Statutes of Missouri 2000 as supplemented through December 31, 2016.

from the evidence that I heard today that Mr. Underwood suffers from both pedophilia and bi-polar disorder. Both of those are qualifying mental disorders under the statute.

I'm not going to go into a lot of detail about why I believe he qualifies as a pedophile, I will simply say that I think there's evidence that he admitted grooming of children and that he finds children attractive, and those two facts in addition to his behavior in molesting children I think qualifies him as a pedophile, in addition to the expert testimony that *he was, in fact, diagnosed as a pedophile by I believe it was eight doctors—so in addition to the two experts that were here today—yesterday and today—and six others.*

(emphasis added). The trial judge's comment simply revealed that she found the State's experts, who diagnosed Underwood with pedophilia, to be credible; the reference to the diagnoses of the other doctors was merely used to explain why she found Underwood's expert, the lone outlier that did not diagnose Underwood with pedophilia, to not be credible.

■ Even if we assume error, "[w]e will reverse for plain error in civil cases only in those situations when the injustice of the error is so egregious as to weaken the very foundation of the process and seriously undermine confidence in the outcome of the case." *Rouse v. Cuvelier*, 363 S.W.3d 406, 418 (Mo. App. W.D. 2012) (citation and internal quotation marks omitted). Based on the evidence presented in this case, even if the trial court erred in considering the diagnoses of the six non-testifying doctors referenced during the testimony of each of the experts, we do not find that "the error is so egregious as to weaken the very foundation of the process and seriously undermine confidence in the outcome of the case." *Id.* (citation and

internal quotation marks omitted). As outlined further in Point VI, the evidence at trial, not including the diagnoses of the six non-testifying doctors, was sufficient to support the trial court's finding that Underwood suffered from a mental abnormality.

Point V is denied.

### Points VI–VIII

In Underwood's remaining points, he alleges that the trial court erred in overruling his motion for a directed verdict and ordering his commitment to DMH. Underwood alleges in Point VI that the trial court's finding that he suffered from a "mental abnormality" was not supported by substantial evidence. In his seventh point, Underwood alleges that the trial court erroneously declared and applied the law regarding the phrase "more likely than not." Underwood argues in his final point that the trial court erred because its finding that Underwood was more likely than not to commit "predatory" acts of sexual violence if not confined was not supported by substantial evidence.

■ "In a court-tried case, a motion for directed verdict submits the issue for decision on the merits and is considered to be a motion for judgment pursuant to Rule 73.01." *Short v. Southern Union Co.*, 372 S.W.3d 520, 529 (Mo. App. W.D. 2012) (citation and internal quotation marks omitted). This court accordingly reviews not whether there was sufficient evidence to submit the case to the jury but "whether the judgment was supported by sufficient evidence. ... Questions of law are reviewed *de novo.*" *George*, 515 S.W.3d at 795–96, 2017 WL 327486, at *2; *Short*, 372 S.W.3d at 529.

### Mental Abnormality

■ Underwood alleges in Point VI that the trial court's finding that he suf-

fered from a mental abnormality was not supported by substantial evidence. Underwood specifically argues that the testimony of Dr. Kline and Dr. Simmons was insufficient to establish that his pedophilia diagnosis was a "mental abnormality" because they did not correctly define the legal standard nor establish the elements required to support a "mental abnormality" conclusion.

█ A "mental abnormality" is defined as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others[.]" § 632.480(2). To establish a mental abnormality, the State must prove by clear and convincing evidence: "(1) a congenital or acquired condition; (2) affecting the emotional or volitional capacity; (3) that predisposes the person to commit sexually violent offenses; (4) in a degree that causes the individual serious difficulty controlling his behavior." *Murrell*, 215 S.W.3d at 106 (citations omitted). The State must further prove that the mental abnormality "makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility." *Id.* at 103 (citing § 632.480(5)) (internal quotation marks omitted).

█ Underwood first argues that both of the State's experts failed to address the second element of "mental abnormality" and thus their opinions regarding whether Underwood suffers from a "mental abnormality" should have been excluded. Section 490.065 allows an expert to testify to an ultimate issue, such as whether a defendant suffers from a "mental abnormality," so long as the opinion is "based upon the established standard of care and not upon a personal standard." *Lee v. Hartwig*, 848 S.W.2d 496, 498 (Mo.

App. W.D. 1992) (citation and internal quotation marks omitted). Although operative legal terms must be adequately defined by the expert or in the question presented to the expert to ensure "that the expert is basing the opinion on well recognized standards[,]" the judge has discretion to determine whether an "adequate definition of an operative legal term has been provided." *Id.* (citation and internal quotation marks omitted). Significantly, "[e]ven when a term does require definition, it need not be recited in ritualistic fashion." *George*, 515 S.W.3d at 798, 2017 WL 327486, at *5 (citing *McLaughlin v. Griffith*, 220 S.W.3d 319, 321 (Mo. App. S.D. 2007) (internal quotation marks omitted)).

The experts both testified that they evaluated Underwood for the existence of a mental abnormality and articulated a definition that closely mirrored the definition of "mental abnormality" found in the Act. While both doctors may have left out the second element regarding emotional or volitional capacity from their recitation of the legal definition, they each addressed that component during their testimony when they specifically discussed that Underwood's pedophilia caused him to have difficulty controlling his emotions and behavior. Their testimony confirms that their opinions were properly based on the correct "mental abnormality" standard, and we find that the trial court did not err in its consideration of the State's case. *See id.* ("[F]or the purposes of determining the foundation of [the expert's testimony as it relate[d] to the submissibility of the State's case, [the expert's] testimony showed that 'the proper legal standard was used,' and was 'based on the law and not something else.'" (citing *McLaughlin*, 220 S.W.3d at 321)).

Underwood next alleges that even if the legal standard was correctly defined, the State still failed to make a submissible

case that Underwood suffered from a "mental abnormality" on either of his diagnoses (pedophilia or bipolar disorder). Underwood argues that the doctors testified to ultimate conclusions without offering facts in support of each element. Underwood also argues that the trial court's oral statements conflicted with the diagnostic criteria relied on by the doctors.

■ As stated above in Point V, the trial judge orally pronounced that she believed from the evidence she heard that Underwood suffered from both pedophilia and bipolar disorder and that both were qualifying mental disorders under the statute. However, "a trial court's oral statements made in ruling on an issue" are typically disregarded, as they are not part of the trial court's judgment. *Harvey v. Dir. of Revenue*, 371 S.W.3d 824, 828 (Mo. App. W.D. 2012) (citation and internal quotation marks omitted). The trial court's judgment found that Underwood suffers from a mental abnormality, and clear and convincing evidence is only needed to support a finding of "mental abnormality" on one of the disorders.

Clear and convincing evidence supported the trial court's finding of mental abnormality. Both of the State's experts diagnosed Underwood with pedophilia and testified that his pedophilia was a "mental abnormality." A pedophilia diagnosis alone satisfies the "mental abnormality" standard. *Murrell*, 215 S.W.3d at 107. However, the State's experts did not rest simply on their pedophilia diagnosis, as each additionally explained how Underwood's pedophilia specifically satisfied each element of the "mental abnormality" standard. The State's experts testified that Underwood's pedophilia was a congenital or acquired condition, and this conclusion was supported by their additional testimony that Underwood's sexual behavior began when he was younger and carried into his cur-

rent placement. As discussed above, both doctors' supported their conclusion that Underwood's pedophilia affected his emotional or volitional capacity, as it caused him to have difficulty controlling his emotions and behavior. This was corroborated by Underwood's engagement in sexual activity in violation of the law, his inability to control his sexual urges while on probation, his engagement in sexual activity in violation of facility rules at DMH, and his inability to restrain his sexual behaviors while under review for potential referral as a sexually violent predator. The doctors also testified that Underwood's pedophilia predisposed him to commit sexually violent offenses. The evidence similarly supported the experts' conclusion that Underwood's pedophilia caused him serious difficulty in controlling his behavior. The fact that Underwood's offenses against his nieces and nephews involved grooming and planned action did not negate Underwood's ultimate inability to control himself as he attempts to now argue.

Point VI is denied.

## "More Likely Than Not"

In his seventh point, Underwood alleges that the trial court erroneously declared and applied the law regarding the phrase "more likely than not." Underwood specifically takes issue with the trial court's comments that there is no numerical correlation to "more likely than not."

■ The State must prove that the mental abnormality "makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility." *Id.* at 103 (citing § 632.480(5)) (internal quotation marks omitted). The phrase "more likely than not" is not defined by the Act and has not been defined by a Missouri court in the sexually violent predator context. However, "[w]here the legislative intent is clear

from the language employed in the statute, we are without authority to read into the statute a[ contrary] intent[.]" *Morgan v. State*, 176 S.W.3d 200, 206 (Mo. App. W.D. 2005) (citation omitted). A percentage risk of over fifty percent as determined by a static score or similar assessment has not been required by Missouri courts. *See, e.g., In re Morgan*, 398 S.W.3d 483, 489–90 (Mo. App. S.D. 2013) (Static assessment results, which indicated low to moderate risk that defendant would reoffend, in conjunction with dynamic factors were sufficient to support conclusion that defendant was more likely than not to reoffend.); *Smith v. State*, 148 S.W.3d 330, 336 (Mo. App. S.D. 2004) (Static assessment results in the medium to low range risk of sexual re-offense in conjunction with other factors supported conclusion that defendant was more likely than not to reoffend.). When the percentage of risk is under fifty percent as determined by an assessment, other variables may be considered to reach a conclusion that the defendant is "more likely than not" to engage in predatory acts of sexual violence. *Id.*

Here, the trial court did not erroneously declare the law regarding the phrase "more likely than not" when it stated that "there's no numerical correlation," "it is left to the common sense of the trier of fact," and "it's not a matter of whether the actuarials say he's more than 50 percent likely to reoffend." The trial court further stated that there are many factors to take into consideration. These declarations were consistent with legal precedent and not an erroneous interpretation of the law.

We also find that the trial court did not erroneously apply the law. Again, we look to the trial court's written judgment, which finds that Underwood's condition makes him more likely than not to engage in predatory acts of sexual violence

if he is not confined in a secure facility. *See Harvey*, 371 S.W.3d at 828. This conclusion is supported by clear and convincing evidence. Both of the State's experts testified that Underwood's static assessment results indicated a moderate to high risk of reoffending. Although the correlating percentages were less than fifty percent, the evidence established that these tools underestimate the risk of re-offense because they rely upon the person being either arrested and charged or actually convicted; it is likely that individuals commit offenses but are never caught or detected. The experts also testified to additional dynamic factors that indicated Underwood was more likely than not to reoffend if not confined in a secure facility. These additional factors included that Underwood's pedophilia predisposed him to commit acts of predatory sexual violence and caused him to have serious difficulty controlling his sexual behavior, that research indicated individuals with antisocial attitudes had an increased likelihood of committing future acts of sexual violence, and that childhood maladjustment is known to have a positive correlation with recidivism. Underwood's poor impulse control, particularly sexually, and issues with medicine compliance were also noted.

Point VII is denied.

**Predatory Acts**

Underwood alleges in his final point that the trial court erred because substantial evidence did not support the finding that he was more likely than not to commit "predatory" acts. Similar to Point VI, Underwood again alleges that because the State's expert did not define "predatory," his testimony on the issue was inadmissible because the finder of fact would not be able to ascertain if the expert used the standard required by law.

■ This issue was recently addressed by this court in *George*, 515 S.W.3d at 796–97, 2017 WL 327486, at *3–5. A "predatory" act is one "directed towards individuals, including family members, for the primary purpose of victimization[.]" § 632.480(3). In *George*, the defendant provided no authority that a "legal or technical term" needs to be defined solely because it is defined in a statute, and we concluded that "predatory," as an "ordinary word[ ] used in its usual or conventional sense[,]" did not need to be defined. *Id.* at 798, *4 (citing *Van Orden*, 271 S.W.3d at 586) (internal quotation marks omitted). We further explained that we did not "see a meaningful distinction between the common definition of 'predator' and its statutory definition" in the context of the Act. *Id.* Moreover, as explained in Point IV, "even when a term does require definition, it need not be recited in ritualistic fashion. Rather, the expert's testimony should prove that the proper legal standard was used. [The factfinder] must know an expert's opinion is based on the law and not something else." *Id.* at 798, *5 (citing *McLaughlin*, 220 S.W.3d at 321) (internal quotation marks omitted).

Dr. Kline testified that Underwood suffered from pedophilia, "a congenital or acquired condition that ... predisposes him to commit acts of *predatory* sexual violence[.]" (emphasis added). Additionally, the State asked:

> Is it your opinion Mr. Underwood will more likely than not reoffend by committing *predatory* acts of sexual violence if not confined to a secure facility for care, custody and treatment?

(emphasis added). Dr. Kline replied, "Yes, it is." Dr. Kline also testified that his opinion was that "Underwood does meet the criteria of a sexually-violent *predator* under Missouri statutes." (emphasis added). Dr. Kline's testimony "makes it clear

that his opinions are based on the definitions contained in § 632.480" and "based on the proper legal standard ... and not something else." *Id.* (citing *McLaughlin*, 220 S.W.3d at 321) (internal quotation marks omitted). Such testimony is "sufficient to make a submissible case that an offender is [a sexually violent predator]." *See George*, 515 SW.3d at 800, 2017 WL 327486, at *6; *In re Care and Treatment of Cokes*, 107 S.W.3d 317, 325 (Mo. App. W.D. 2003).

The evidence was also sufficient to establish that Underwood was "more likely than not to sexually reoffend. . . in a predatory and violent manner[.]" *George*, 515 S.W.3d at 799, 2017 WL 327486, at *5. Underwood first relies on *Cokes*, where the expert's testimony that the defendant was more likely than not to reoffend "was insufficient to support a determination that he was likely to 'reoffend in a *predatory* and violent way.'" *George*, 515 SW.3d at 799, 2017 WL 327486, at *6 (emphasis added) (quoting *Cokes*, 107 S.W.3d at 322–23). The facts here are distinguishable in that the expert specifically testified that Underwood was more likely than not to reoffend by committing *predatory* acts of sexual violence.

Underwood also relies on *Morgan*, 176 S.W.3d 200. In *Morgan*, "the State had stipulated and agreed to the use of the prior definition of 'predatory act' ... [which required] evidence that a relationship had been established or promoted with the victim for the primary purpose of victimization[,]" so the testimony had been insufficient to meet the agreed-upon standard. *George*, 515 S.W.3d at 800, 2017 WL 327486, at *6 (quoting *Morgan*, 176 S.W.3d at 207) (internal quotation marks omitted). Under the standard applicable here, evidence of prior sexual violence and assessment results has been held "sufficient to demonstrate that the appellant's prior acts

of sexual violence were predatory in nature[.]" *Id.* at *7 (quoting *Morgan* at 207).

Finally, as discussed in Point VII, the evidence was sufficient to prove that Underwood was "more likely than not" to reoffend by committing predatory acts of sexual violence.

Point VIII is denied.

## CONCLUSION

Because Underwood fails to establish any reversible error, the trial court's judgment is affirmed.

All concur.